**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ROBERT INGRUM,** | ) | |
| | ) | **No. 07-12L** |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **Hon. Mary Ellen Coster Williams** |
| | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT'S RENEWED MOTION TO DISMISS**
**AND MEMORANDUM IN SUPPORT THEREOF**

RONALD J. TENPAS
Environment & Natural Resources Division
Assistant Attorney General

BRUCE K. TRAUBEN
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0238 (phone)
(202) 305-0506 (fax)

OF COUNSEL:
CPT. LISA SATTERFIELD
U.S. Army Litigation
901 N. Stuart Street, Suite 400
Arlington, VA 22203
(703) 696-1564

Dated: January 25, 2008

# TABLE OF CONTENTS


MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM IN SUPPORT OF DEFENDANT'S RENEWED MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. STATEMENT OF MATERIAL FACTS FOR WHICH THERE CAN BE NO GENUINE DISPUTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III. PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

A. The Applicable Standard under RCFC 12(b)(1) . . . . . . . . . . . . . . . . . . . . 12

B. Claim Accrual under the Statute of Limitations, 28 U.S.C. § 2501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

C. Plaintiff's Claim Accrued in 1999, When He Should Have Known About the Events Giving Rise to His Claim . . . . . . . . . . . 14

D. The Statute of Limitations Cannot Be Equitably Tolled . . . . . . . . . . . . 19

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF AUTHORITIES

## CASES

Braude v. United States,
218 Ct. Cl. 270 (1978) . . . . . . . . . . 18

Celotex Corp. v. Catrett,
477 U.S. 31 (1986) . . . . . . . . . . 13

Goodrich v. United States,
434 F.3d 1329 (Fed. Cir. 2006) . . . . . . . . . . 14

Hopland Band of Pomo Indians v. United States,
855 F.2d 1573 (Fed. Cir. 1988) . . . . . . . . . . 12, 14

Jakoby v. United States,
38 Fed.Cl. 192 (1997)152 F.3d 940 (Fed. Cir. 1998) . . . . . . . . . . 14

Japanese War Notes Claimant's Ass'n. Inc. v. United States,
178 Ct. Cl. 630 (1967) . . . . . . . . . . 18

John R. Sand & Gravel Co. v. United States,
457 F.3d 1345 (Fed. Cir. 2006) . . . . . . . . . . 14

John R. Sand & Gravel Co. v. United States,
No. 06-1164, 2008 WL 65445 (U.S. Jan. 8, 2008) . . . . . . . . . . 4, 12, 13, 19

Kendall v. United States,
107 U.S. 123 (1883) . . . . . . . . . . 13

LaFont v. United States,
17 Cl. Ct. 837 (1989) . . . . . . . . . . 17-19

MacLean v. United States,
454 F.3d 1334 (Fed. Cir. 2006) . . . . . . . . . . 12

Maher v. United States,
314 F.3d 600 (Fed. Cir. 2002), cert. denied, 540 U.S. 821 (2003) . . . . . . . . . . 12

Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986) . . . . . . . . . . 13

Mitchell v. United States,
10 Cl. Ct. 63 (1986) . . . . . . . . . . 14, 17

Newby v. United States,
57 Fed. Cl. 283 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Patton v. United States,
64 Fed. Cl. 768 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 17

Reynolds v. Army & Air Force Exch. Serv.,
846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Toxgon Corp. V. BNFL, Inc.,
312 F.3d 1379 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Truckee-Carson Irrigation Dist. v. United States,
14 Cl. Ct. 361, aff'd, 864 F.2d 149 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 13

**STATUTES**

28 U.S.C. § 1497 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
28 U.S.C. § 1500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
28 U.S.C. § 2501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**RULES**

RCFC 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10, 12, 13
RCFC 12(h)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12, 13
RCFC 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13

## APPENDIX OF EXHIBITS

| Exhibit No. | Exhibit Description |
|---|---|
| 1 | General Warranty Deed (All Cash) dated March 16, 1999 |
| 2 | Excerpts from Deposition Transcript of Robert Ingrum dated December 10, 2007 |
| 3 | Amendment of Contract of Sale dated March 16, 1999 |
| 4 | Property Earnest Money Contract attached to Letter from Larry Townsend to Alan L. Wittenberg dated May 21, 1998 |
| 5 | Affidavit Regarding Compliance with Contract Obligations and Acceptance of Property dated March 16, 1999 |
| 6 | Map of Texas & Pacific Railway Company Block No. 2, Sections 14-18, with annotations by Mr. Ingrum |
| 7 | Plaintiff's Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents dated October 17, 2007 |
| 8 | Plaintiff's First Supplemental Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents (undated) (received November 14, 2007) |
| 9 | Photographs taken by Mr. Ingrum (Including a Photograph of the Excavation Site at D0013). |

## MOTION

Pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), Defendant, the United States, hereby renews its motion to dismiss for lack of jurisdiction, because Plaintiff untimely filed this action under 28 U.S.C. § 2501.[1/] RCFC 12(h)(3) authorizes the Court to dismiss an action under RCFC 12(b)(1) at any time when it appears that it lacks jurisdiction. The events allegedly giving rise to Plaintiff's taking claim occurred in March through April 1999. Pursuant to 28 U.S.C. § 2501, Plaintiff thus had six years from April 1999, through April 2005, to bring a claim against the United States. Plaintiff did not file suit, however, until January 9, 2007, which is more than nineteen (19) months after the statute of limitations had expired. The Court, therefore, should grant Defendant's motion. For its grounds in support of this motion, Defendant refers the Court to its Memorandum, below.

---

[1/] Alternatively, the Court may consider this motion as one for summary judgment under RCFC 56. There are no material facts in dispute that would preclude summary judgment in this case. Moreover, to the extent that this Court determines there to be material facts in dispute, those facts touch on this Court's jurisdiction and, thus, the Court may consider relevant evidence beyond the complaint to resolve the factual dispute. Such relevant evidence is presented herein.

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S RENEWED MOTION TO DISMISS**

## I. INTRODUCTION

In this action, the plaintiff Robert Ingrum seeks compensation pursuant to the Fifth Amendment for an alleged taking of his property.[2/] Mr. Ingrum alleges that in March through April 1999, the federal government acting through the military took fill material from his property "to repair several miles of the [River Road]," an unpaved section of Highway 170. Complaint, ¶¶ 4.2, 4.5. Although the taking allegedly was completed by April 1999, Mr. Ingrum did not bring this action until January 9, 2007, almost eight years later.

Accordingly, Defendant contends that this action was untimely filed under the applicable six-year statute of limitations, 28 U.S.C. § 2501, and must be dismissed. Plaintiff had six years from April 1999 to bring a claim against the United States, or until some time in April 2005, but failed to do so. The Court, therefore, does not have jurisdiction over this action.

In an attempt to save his takings claim, Mr. Ingrum contends that the government's "construction of the road prohibited [him] from accessing his property." Complaint, ¶ 4.5. He alleges in his Complaint that "the damage was undiscoverable [by] Plaintiff," until he learned about the excavation site in May of 2004 by a neighboring property owner. Id. Plaintiff contends that his claim did not accrue, therefore, until he learned about the excavation site in May 2004.

The indisputable facts show, however, that: (1) the excavation site giving rise to Mr. Ingrum's claim was first used by the military for road work performed in 1998, before Mr.

[2/] Mr. Ingrum is seeking $324,000 as "just compensation," which is more than three times the amount he paid ($98,339.61) for the entire property (3,278 acres) on March 16, 1999. See § II, infra.

Ingrum bought the property "as is" and "with all faults" in 1999; (2) the excavation site is plainly visible from River Road; (3) Mr. Ingrum's property is accessible from the north along River Road as well as the south; (4) at times when the southern route to Mr. Ingrum's property became temporarily impassable after a heavy rain, it remained accessible from the north; (5) Mr. Ingrum chose not to access his property from the north; (6) the U.S. Border Patrol ("USBP") continued to regularly use the road after it was repaired by the military; and (7) a USBP employee whom Mr. Ingrum often contacted to inquire about the condition of the road from 1999 to 2005 informed him on many occasions that the road was passable. Mr. Ingrum's claim that he could not access his property for five years to timely learn about the excavation site simply strains credulity.

Moreover, Mr. Ingrum's assertion that he learned about the excavation site for the first time in May 2004 from a neighboring property owner could not be verified because, as Mr. Ingrum admitted during discovery, that individual was not a neighboring landowner as he previously attested in an affidavit submitted to the Court, but a transient worker whose full name and address he did not know.

The facts show that Mr. Ingrum timely should have known about the excavation site, and thus his claim accrued no later than April 1999. Because Plaintiff untimely filed his complaint in 2007, this action should be dismissed for lack of jurisdiction under the statute of limitations, 28 U.S.C. § 2501.[3/]

## II. STATEMENT OF MATERIAL FACTS FOR WHICH THERE CAN BE NO GENUINE DISPUTE

---

[3/] The U.S. Supreme Court recently made clear that 28 U.S.C. § 2501 is "jurisdictional" and cannot be equitably tolled. John R. Sand & Gravel Co. v. United States, No. 06-1164, 2008 WL 65445 at *4 (U.S. Jan. 8, 2008).

Plaintiff, Robert Ingrum, purchased 3277.987 acres of land near Candelaria, Presidio County, Texas (the "Candelaria Property") on March 16, 1999 from the Chanosky Estate Trust ("Chanosky Estate").[4/] See Ex. 3 (Amendment of Contract of Sale); see also Ex. 1 (General Warranty Deed, March 16, 1999); Ingrum Tr. at 44:10-46:25.[5/] Mr. Ingrum bought the Candelaria Property from the Chanosky Estate "AS IS" and "WITH ALL FAULTS." See Ex. 5 (Affidavit Regarding Compliance with Contract Obligations and Acceptance of Property, March 16, 1999, at Bates No. D 0018) (emphasis as in original); see also Ingrum Tr. at 32:23-33:6. Mr. Ingrum paid $30.00 per acre for the 3277.987 acres, or $98,339.61 total – less than one-third of the amount he now seeks as just compensation in this action. See Ex. 3; see also Complaint at 4.

A right of way for Highway 170 running across the Candelaria Property was expressly excluded in the deed conveying the property from the Chanosky Estate to Mr. Ingrum. See Ex. 1; see also Complaint, ¶ 4.2. The unpaved section of Highway 170 that runs across Mr. Ingrum's property is also known as "River Road." See Complaint, ¶ 4.2; see also Declaration of Terry M. Norman, ¶ 5 ("Norman Declaration").

River Road is used by the U.S. Border Patrol to interdict narcotics being smuggled into the United States from Mexico, across the adjacent Rio Grande River.[6/] Complaint, ¶ 4.2; see

---

[4/] In his Complaint and Affidavit of April 20, 2007 (Dkt. #9), Mr. Ingrum asserts that he bought the Candelaria Property in 1998, but that date is not accurate. Compare Complaint, ¶ 4.1 and April 20, 2007 Affidavit of Robert Ingrum (Dkt. #9), ¶ 2 with General Warranty Deed (Ex. 1) and Ingrum Tr. at 128:14-129:20. All cited excerpts to Ingrum Tr. are attached at Ex. 2, hereto.

[5/] The March 16, 1999 Amendment of Contract of Sale (Ex. 3) adjusted upward by about 1.4 acres the acreage of land near Candelaria that Mr. Ingrum purchased, based upon a survey conducted prior to closing, but the price per acre did not change since Mr. Ingrum entered into an Earnest Money Contract on or about May 11, 1998. See Ex. 4 (Property Earnest Money Contract).

[6/] The U.S. Border Patrol is now part of U.S. Customs and Border Protection, a component of the
(continued...)

also Norman Declaration, ¶ 4; Declaration of Humberto Hernandez, ¶ 3 ("Hernandez Declaration"). In 1997, part of River Road south of the Candelaria Property eroded away and no longer was passable. See Norman Declaration, ¶¶ 8, 11 & Ex. D at US00707; see also Hernandez Declaration, ¶ 4. Consequently, the USBP sought and obtained the assistance of the military's Joint Task Force-6 (JTF-6) to build a by-pass route around the washed out section, among other improvements to the road.[7/] See Norman Declaration, ¶¶ 8-10.

For the 1998 road improvement project, JTF-6 used fill material from the Candelaria Property. See Norman Declaration, ¶¶ 13, 14 & Ex. E; see also Hernandez Declaration, ¶ 5. The material for the road was not removed from a pit dug into the ground, but was taken from the side of a hill at the site. See Norman Declaration, ¶¶ 22, 23, Exs. E & H; see also Hernandez Declaration, ¶ 5; Ingrum Tr. at 88:10-14 (describing the site "mainly as a scraping from the side"). The 1998 excavation site is the site of the "pit" that is the subject of Mr. Ingrum's Complaint.[8/] See Complaint, ¶ 4.5; see also Ingrum Tr. at 75:14-76:23 (identifying the excavation site in December 4, 2007 photographs as the pit about which he is complaining); Norman Declaration, ¶¶ 14, 22, Exs. E & H (identifying the 1998 excavation site as the same one depicted in the December 4, 2007 photographs that were shown to Mr. Ingrum at his deposition).

---

[6/](...continued)
Department of Homeland Security.

[7/] Plaintiff alleges in his Complaint that the work was performed by the Army Corps of Engineers, however, it was actually performed by JTF-6, which was staffed by personnel from both the Army and Marine Corps. Of course, that distinction is not material, because all of these entities are part of the Unite States government.

[8/] Indeed, while there is indisputable, photographic evidence that material was removed from the excavation site in 1998, before Mr. Ingrum bought the Candelaria Property on March 16, 1999, there is no evidence that material was again removed from the excavation site after he bought the property. Nevertheless, for the purposes of this motion only, Defendant will assume that some additional quantum of material was removed from the site on or after March 16, 1999.

This excavation site is plainly visible from River Road, and USBP Agent Hernandez has used the site as a landmark when on patrol along the road since it was created in 1998 – especially at night because it would reflect the beam from his search light. See Hernandez Declaration, ¶ 6; see also Norman Declaration, ¶ 22. The so-called "gravel pit" is thus located within view of the road in Section 16, the middle of five sections owned by Mr. Ingrum (Nos. 14-18), and north of the alleged "bog." See Ingrum Tr. at 48:6-49:7; see also Ex. 6 (Survey Map with annotations by Mr. Ingrum).

Before the by-pass was built in 1998, the USBP mainly accessed River Road from the north, via Chispa Road (FM 2017). See Norman Declaration, ¶ 9; see also Hernandez Declaration, ¶ 4. After JTF-6 built the by-pass route in 1998, however, River Road was accessible from both the north, via Chispa Road, and from the south, through Candelaria, Texas. See Norman Declaration, ¶ 9; see also Hernandez Declaration, ¶ 6.

Heavy rains in mid-1998 washed out some of the road work completed earlier in the year, requiring JTF-6 to return in early 1999 to make repairs. See Norman Declaration, ¶ 15; see also Hernandez Declaration, ¶ 6. Still, before the 1999 repairs were made, River Road was often accessible from the north, via Chispa Road. See Norman Declaration, ¶ 15; see also Hernandez Declaration, ¶ 6.

In about March through April 1999, JTF-6 repaired the road by, among other things, building cement culverts over creek beds and installing cement slabs in low-lying areas. See Norman Declaration, ¶ 17 & Ex. G; see also Hernandez Declaration, ¶ 7. Mr. Norman, the Assistant Patrol Agent in Charge of Marfa Station, served as the Border Patrol's liaison to JTF-6 and the public. See Norman Declaration, ¶ 16. In his latter capacity, Mr. Norman was responsible for obtaining executed Right of Entry ("ROE") forms from adjacent landowners. Id.

In about February, 1999, Mr. Norman was informed by Mr. Wittenberg, counsel for the Chanosky Estate, that Mr. Ingrum was in the process of acquiring the Chanosky Estate's Candelaria Property. Id. Communicating through Mr. Wittenberg, Mr. Norman obtained written permission from Mr. Ingrum "to do road work on the property," dated February 26, 1999. See Norman Declaration, ¶ 16 & Ex. F at US00672; see also Ingrum Tr. at 50:16-51:14, 52:17-53:4, 55:1-20. Mr. Ingrum also executed a ROE form dated March 13, 1999, just days before closing on the Candelaria Property on March 16, 1999. See Ingrum Tr. at 49:24 - 50:12; see also Norman Declaration, ¶ 16 & Ex. F at US00670-71. When explicitly provided the option to elect whether material from his property could be used by the government during the 1999 improvement project, Mr. Ingrum remained silent. See Norman Declaration, ¶ 16 & Ex. F; see also Ingrum Tr. at 53:5-18.

After the 1999 repairs were completed, the USBP again accessed River Road from the south, through Candelaria, as well as from the north, via Chispa Road. See Norman Declaration, ¶ 17; see also Hernandez Declaration, ¶ 8. USBP Agent Hernandez continued patrolling River Road at least two to three times a week from 1999 through 2003 (except when on detail), again using the excavation site on the Candelaria Property as a landmark. See Hernandez Declaration, ¶ 8. Occasionally, the road would become impassable after a heavy rain, but it often remained accessible from the north, including the section of road running across the Candelaria Property. See Norman Declaration, ¶ 20; see also Hernandez Declaration, ¶ 9. Mr. Ingrum, however, chose not to use the northern route, because it was a longer, less convenient, drive. See Ingrum Tr. at 27:11-14, 112:10-113:17.

For about two years after JTF-6 repaired the road in 1999, Presidio County maintained it with a grader. See Norman Declaration, ¶ 18; see also Hernandez Declaration, ¶ 10. During

those years when the County maintained the road, USBP Agent-in-Charge Norman would drive the road in a four-wheel drive vehicle, but engaging only two-wheel drive. See Norman Declaration, ¶ 18. Several years after the 1999 repairs were made, the road conditions began to deteriorate because Presidio County stopped maintaining it. See Hernandez Declaration, ¶ 10. Still, the road has remained passable more often than not, especially from the north. See Norman Declaration, ¶ 20; see also Hernandez Declaration, ¶ 3, 10.

After he bought the Candelaria Property on March 16, 1999, Mr. Ingrum contacted USBP's Marfa Station numerous times to inquire about the condition of River Road. See Hernandez Declaration, ¶¶ 12, 13; see also Ingrum Tr. at 59:6-10. Mr. Ingrum often spoke with Agent Hernandez about the condition of the road, even contacting Agent Hernandez at his residence on at least one occasion. See Hernandez Declaration, ¶ 12. Rather than wait to be contacted by Mr. Ingrum, Agent Hernandez would call Mr. Ingrum on occasion to report on the condition of River Road. Id. Although the frequency of the contacts would vary, Agent Hernandez estimates that he spoke with Mr. Ingrum on average at least once a month, or 60 times, regarding the condition of the road from 1999 through 2005. Id. From 1999 to late 2003, Agent Hernandez reported many times to Mr. Ingrum that River Road was passable, estimating that he reported to Mr. Ingrum that the road was passable about 75% of the times he spoke with Mr. Ingrum about the condition of the road. Id., ¶ 13.

In both his Complaint and in his affidavit filed with the Court on April 20, 2007, Mr. Ingrum asserts that he first learned about the "pit" from "a neighboring property owner" in May 2004. See Complaint, ¶ 4.5; Affidavit of Robert Ingrum, April 20, 2007 (Dkt. #9), ¶ 6. During discovery, however, Mr. Ingrum admits that this statement is inaccurate, and now asserts that he

learned about the "pit" from a migrant worker possibly named "Lupe."[9] See Ingrum Tr. at 79:13-81:15; see also Ex. 7 (Plaintiff's Responses to Defendant's First Set of Interrogatories, at 2); Ex. 8 (Plaintiff's First Supplemental Responses to Defendant's First Set of Interrogatories, at 2). Interestingly, Mr. Ingrum testified at his deposition that he has "never spoken to an owner of neighborhood property . . . since I've been out there. Never have." Ingrum Tr. at 82:23-25.

## III. PROCEDURAL BACKGROUND

On August 2, 2006, Plaintiff filed a complaint in the United States Court of Federal Claims arising from the same events alleged in this action. See Robert Ingrum v. United States, No. 06-566L (Fed. Cl.). Defendant moved to dismiss that action on December 1, 2006, on the ground that the Court did not have jurisdiction because the limitations period under 28 U.S.C. § 2501 had expired. Before Plaintiff responded to Defendant's motion, however, Plaintiff filed an unopposed motion to voluntarily dismiss his 2006 action to cure a potential jurisdictional problem arising under 28 U.S.C. § 1500 (Plaintiff had filed suit in the U.S. District Court for the Western District of Texas against the United States on August 1, 2006, alleging a taking arising from the same events). On December 19, 2006, the Court granted Plaintiff's unopposed motion to voluntarily dismiss, without prejudice to re-filing.

---

[9] Because the current location of this individual is not known, it was not possible for Defendant to obtain discovery from the person who allegedly first brought the excavation site to Mr. Ingrum's attention. In addition to Lupe, Mr. Ingrum could not recall the names of others who might have relevant information regarding the property such as lessors, potential lessors or potential buyers. For example, when Mr. Ingrum purchased the Candelaria Property he had hoped to sell off part of it quickly for a profit and had an interested buyer whose name he could not remember. Ingrum Tr. at 15:15-16:7. There were lessees on the property after Mr. Ingrum purchased it, but he could not recall their names. Ingrum Tr. 19:5-20, 60:10-15, 139:15-21. And the leases were not in writing. Ingrum Tr. at 19:19-20, 139:15-21. Plaintiff tried to lease recreational rights to the property, but could not recall the names of any of the potential lessors and has no documentation. Ingrum Tr. at 139:5-24.

Plaintiff filed his complaint in the instant action on January 9, 2007 (Dkt. #1), raising the same allegations as in the prior action, and the government again moved to dismiss pursuant to RCFC 12(b)(1). (Dkt. #6.) In its February 20, 2007, motion, the government argued that the Court lacks jurisdiction over this matter because Plaintiff's claim accrued in April 1999 and, therefore, was untimely filed on January 9, 2007. See Motion to Dismiss and Memorandum in Support Thereof at 5-9 ("Motion to Dismiss"). Accepting the allegations in the Complaint as true, Defendant argued that Plaintiff should have known about the events giving rise to his claim in 1999. See Motion to Dismiss at 6-9.

Relying on Plaintiff's Affidavit, Plaintiff responded to Defendant's motion on April 20, 2007, (Dkt. #9) by arguing that he could not discover the excavation "pit" until after it was brought to his attention by a neighbor during the spring of 2004. See Plaintiff's Response to Defendant's Motion to Dismiss at 4.

The Court denied the government's motion to dismiss without prejudice on June 26, 2007 (Dkt. #11), finding that it was unclear on the record before it whether Plaintiff should have known that material was removed from his property in 1999. See Memorandum Opinion and Order Denying Defendant's Motion to Dismiss at 3 ("June 26, 2007 Order"). More specifically, the Court found that the

> record does not reveal from what vantage the hole could be observed, where on Plaintiff's 3,300 acres of land the hole was, whether access to the hole was blocked by the Corps' flooding of the River Road, and how often and when Plaintiff tried to access the land or contacted the Border Patrol about the condition of the road.

June 26, 2007 Order at 3-4. The Court also noted that "[w]hile Plaintiff's neighbor eventually viewed the damage to Plaintiff's land, it is not clear how this neighbor accessed the land or how far he had to travel before the hole became visible." Id. at 4. The Court also could not

determine on the record before it "whether the doctrine of equitable tolling should be applied." Id.

After a telephonic status conference was held with counsel on July 16, 2007, the Court issued a Scheduling Order that day (Dkt. #13), setting due dates for the completion of discovery on December 31, 2007,[10] and for Defendant's "renewed motion to dismiss" on January 25, 2008.

## IV. ARGUMENT

This action should be dismissed because it was filed well more than six years after the date upon which Plaintiff's claim accrued. See 28 U.S.C. § 2501. It cannot be disputed that Defendant used material from the Candelaria Property for road work performed in 1998, one year before Plaintiff bought the property on March 16, 1999. As stated above in footnote 8, there is no evidence that the government took material from Plaintiff's property on or after March 16, 1999, but, for the purposes of this motion only, Defendant will assume that some quantum of material was removed from Plaintiff's property for the 1999 repair project, after Mr. Ingrum acquired the property. Because, as the facts show, Mr. Ingrum should have known that the government used material from his property for the road improvement project, his claim accrued in 1999 and, therefore, was filed untimely in 2007.

The excavation site is not a pit or a hole in the ground, but was created by shaving off the side of a hill. The vertical wall left behind is plainly visible from River Road, and is used by at least one USBP agent as a landmark even at night because it reflects light off his search light.

[10] On December 28, 2007, Plaintiff supplemented his Rule 26 disclosure by identifying additional witnesses, apparently experts, whom he may rely upon if this matter progresses to trial. In December 31, 2007, correspondence, Defendant reserved its right to designate counter-experts and suggested that the parties first obtain a ruling on this motion before incurring the expense of retaining experts and conducting expert discovery. Plaintiff's counsel did not respond to Defendant's suggestion. Nevertheless, expert discovery remains to be completed if Defendant's motion is denied.

Mr. Ingrum was told on many occasions that the road to his property was passable. At times, even if the road to Mr. Ingrum's property was not passable from the south, through Candelaria, Texas, it remained open from the north – a route that Mr. Ingrum chose to avoid because of its length and not because it was impassable. If Mr. Ingrum had undertaken any inquiry or investigation, he would have learned of the alleged use of material from his property for the road. Because Plaintiff's claim accrued by April1999, this action should have been filed no later than April 2005, and it was untimely when filed on January 9, 2007. Moreover, the statute of limitations may not be equitably tolled. John R. Sand & Gravel Co., 2008 WL 65445 at *4.

**A. The Applicable Standard under RCFC 12(b)(1)**

Whether this Court has jurisdiction to hear a plaintiff's claim is a question of law. See Toxgon Corp. v. BNFL, Inc., 312 F.3d 1379, 1381 (Fed. Cir. 2002) ("the existence of subject matter jurisdiction is a question of law"); Maher v. United States, 314 F.3d 600, 603 (Fed. Cir. 2002) (noting that the Federal Circuit reviews de novo whether the Court of Federal Claims possessed jurisdiction because this is a question of law), cert. denied, 540 U.S. 821 (2003). In the Court of Federal Claims the statute of limitations 'is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed.'" MacLean v. United States, 454 F.3d 1334, 1336 (Fed. Cir. 2006) (quoting Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir.1988)); see also John R. Sand & Gravel Co., 2008 WL 65445 at *3. "[U]nder [Court of Federal Claims] Rule 12(h)(3) this court is mandated to. . . dismiss the action '[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter . . . .'" Truckee-Carson Irrigation Dist. v. United States, 14 Cl. Ct. 361, 368, aff'd, 864 F.2d 149 (Fed. Cir. 1988) (quoting RCFC 12(h)(3)) (emphasis as in original).

When deciding a motion to dismiss based on a lack of subject matter jurisdiction, pursuant to RCFC 12(b)(1), the court must assume that all undisputed facts alleged in the Complaint are true and must draw all reasonable inferences in the non-movant's favor. Newby v. United States, 57 Fed. Cl. 283, 290 (2003). If the government's motion challenges the truth of the jurisdictional facts alleged in the complaint, the court may consider relevant evidence beyond the Complaint in order to resolve the factual dispute. Reynolds v. Army & Air force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988) (citing Land v. Dollar, 330 U.S. 731, 735 (1947)). "Once the court's subject matter jurisdiction is put into question, it is 'incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction. [The plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.'" Patton v. United States, 64 Fed. Cl. 768, 773 (2005) (quoting Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988)) (alterations as in original).[11/]

---

[11/] If the Court considers this to be a motion for summary judgment under RCFC 56, it may award summary judgment if the government shows that it is entitled to judgment as a matter of law, and there exist no genuine issues of material fact which would defeat judgment in its favor. See Fed. R. Civ. P. 56(c); Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986). Normally, the moving party has the burden of showing the absence of a triable issue, or, stated otherwise, the "absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Because Defendant's motion is based upon the statute of limitations (28 U.S.C. § 2501), which is jurisdictional (see John R. Sand & Gravel Co., 2008 WL 65445 at *4, quoting Kendall v. United States, 107 U.S. 123, 125-126 (1883)), this motion puts the Court's jurisdiction into question, shifting the burden to Plaintiff. See Patton, 64 Fed. Cl. at 773.

**B. Claim Accrual under the Statute of Limitations, 28 U.S.C. § 2501**

The applicable six-year statute of limitations states that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim **first accrues**." 28 U.S.C. § 2501 (emphasis added). "A cause of action first accrues when all the events which fix the government's liability have occurred and the plaintiff was or **should have been** aware of their existence." Jakoby v. United States, 38 Fed.Cl. 192, 194 (1997), aff'd, 152 F.3d 940 (Fed. Cir. 1998) (emphasis added); see also John R. Sand & Gravel Co. v. United States, 457 F.3d 1345,1355-56 (Fed. Cir. 2006) (citing Goodrich v. United States, 434 F.3d 1329, 1333 (Fed. Cir. 2006)); Hopland Band of Pomo Indians v. United States, 855 F.2d at 1577. "Constructive knowledge of a cause of action, rather than actual knowledge, is all that is required to trigger the running of the statute of limitations." Patton, 64 Fed. Cl. at 774 (citing Mitchell v. United States, 10 Cl. Ct. 63, 68 (1986)).

**C. Plaintiff's Claim Accrued in 1999, When He Should Have Known About the Events Giving Rise to His Claim**

There is no dispute that the governmental action that forms the basis for Plaintiff's takings claim was completed during April 1999. Compl. ¶ 4.2. Certainly, there is no evidence that the federal government performed any additional repairs to the road after April 1999. Plaintiff argues, however, that he could not learn about the excavation site until May 2004, when a migrant worker named "Lupe" brought it to his attention. See Ingrum Tr. at 79:13-81:15; see also Ex. 7 (Plaintiff's Responses to Defendant's First Set of Interrogatories, at 2); Ex. 8 (Plaintiff's First Supplemental Responses to Defendant's First Set of Interrogatories, at 2). Assuming that Plaintiff did not have actual knowledge of the excavation site, as he alleges, the question then before the Court is whether Plaintiff should have known in 1999 that the

government had excavated a "substantial amount of landfill" (Complaint, ¶ 4.5), giving rise to his claim. The plain answer is "yes," as discussed below.

When denying the government's February 20, 2007 motion to dismiss, the Court found that the record did not reveal from what vantage point the excavation site could be observed. See June 26, 2007 Order at 3-4. The indisputable, photographic evidence shows that the excavation site is in plain view from River Road. See Norman Declaration, ¶ 22, Ex. E & Ex. H at US00992; see also Hernandez Declaration, ¶ 8. Agent Hernandez has been using this site as a landmark when on patrol in the area since it was first created in 1998. See Hernandez Declaration, ¶¶ 6, 8. Mr. Ingrum also should have been able to see the site from the road. Indeed, in early 2005, Mr. Ingrum was able to locate the site "close to dusk" to take a picture of it. See Ingrum Tr. at 66:24-67:18 (discussing the site shown at D0013, attached hereto as Ex. 9, and identifying it as the pit he is "complaining about"). The site shown in D0013 (marked Ingrum Dep. Ex. 10), is the same site shown in Exs. E & H (at US00992) to Mr. Norman's Declaration. See Ingrum Tr. at 75:14-76:23; see also Norman Declaration, ¶¶ 14, 21, 22.

In its June 26, 2007 Order, the Court also found that the record does not reveal "whether access to the [excavation site] was blocked by the Corps' flooding of the River Road." June 26, 2007 Order at 4. There absolutely is no evidence, however, that the federal government flooded the road, which crosses low-lying areas adjacent to the Rio Grande River. See Norman Declaration, ¶ 10 & Ex. D. Regardless, even if the road south of Mr. Ingrum's property should flood, Mr. Ingrum's property still could be accessed from the north. See Norman Declaration, ¶ 20; see also Hernandez Declaration, ¶ 9. Mr. Ingrum chose to avoid the northern route not because it was impassable, but because it was longer. See Ingrum Tr. at 27:11-14, 112:10-

113:17. Mr. Ingrum has no excuse for not timely learning about the excavation site on his property.

Mr. Ingrum often contacted the Border Patrol about the condition of the road, and was told on many occasions by Agent Hernandez that the road was passable. See Hernandez Declaration, ¶¶ 12, 13. According to Agent Hernandez, he spoke with Mr. Ingrum on average at least once a month for several years, including the time period from April 1999 through 2003. Id., ¶ 12. On at least one occasion, Mr. Ingrum even called Agent Hernandez at his home, and on occasions Agent Hernandez would call Mr. Ingrum to report on the condition of the road. Id. During that time period, 1999 to late 2003, Agent Hernandez often reported – about 75% of his reports on the road's condition – to Mr. Ingrum that the road was passable. Id., ¶ 13. Mr. Ingrum, therefore, had ample opportunities to visit his property and see the excavation site years before he allegedly learned about it in 2004.

Mr. Ingrum also alleges that the road was impassable each time he visited the Candelaria Property, preventing him from discovering the excavation (Compl. ¶ 4.4). But the USBP was able to use the road for several years after it was repaired, without difficulty. See Norman Declaration, ¶¶ 18, 19; see also Hernandez Declaration, ¶¶ 8-10. The road's condition only began to deteriorate several years later, when Presidio County stopped maintaining it, but it still remained passable more often than not (even to the present), especially from the north. Norman Declaration, ¶¶ 18, 20, 21; see also Hernandez Declaration, ¶¶ 3, 10, 11. Even if true that Mr. Ingrum could not access the property from the south through Candelaria, he chose not to attempt to access his property from the north. See Ingrum Tr. at 27:11-14, 112:10-113:17. Certainly, Mr. Ingrum's failure to attempt to access the property from the north cannot be blamed on the government.

The facts thus show that Mr. Ingrum timely should have known about the excavation site giving rise to his claim. Accordingly, Plaintiff's claim accrued no later than April 1999, and this action was filed untimely in 2007.

Moreover, as a matter of law, Plaintiff's claim accrued in 1999 and is time barred. "The assumption underlying the 'all events' test [for claim accrual] is that an individual will act with reasonable diligence in the protection of his interests and in so doing, the individual will become aware of acts of another that invade or injure his interests." Patton, 64 Fed. Cl. at 774 (citing Mitchell, 10 Cl. Ct. at 67). "Reasonable diligence requires that where there is reason to suspect[,] there is reason to inquire and, therefore, [w]hatever is notice enough to excite attention and put the party on his guard and call for inquiry, is [also] notice of everything to which such inquiry might have led." Id. (quoting Mitchell, 10 Cl. Ct. at 67-68) (internal quotation marks omitted) (alterations as in original). In other words, "[a] claimant is charged with notice of whatever facts an inquiry appropriate to the circumstances would have uncovered." Id. (quoting Mitchell, 10 Cl. Ct. at 68) (internal quotation marks omitted).

In LaFont v. United States, 17 Cl. Ct. 837 (1989), the plaintiff argued that the statute of limitations under 28 U.S.C. 2501[12/] did not begin to run until he discovered the damages to his oyster lease from dredging operations conducted on behalf of the Corps of Engineers. LaFont, 17 Cl. Ct. at 842. Plaintiff was aware that the dredging operations were taking place in the waterway, but alleged that he did not discover the damages until two or three weeks later. Id. As the Court observed, however, the plaintiff did not allege that "the Corps concealed the dredging operations so that plaintiff was unaware of its existence." Id. The "[d]redging in the

[12/] Because the plaintiff's claim arose from damage to an oyster bed, it came before the court under 28 U.S.C. § 1497, with respect to which a two-year statute of limitations applied under 28 U.S.C. § 2501. LaFont, 17 Cl. Ct. at 838 nn.1 & 2.

Waterway was an obvious act and one undoubtedly known to plaintiff . . . ." Id. Additionally, the spoils from the dredging operation were "visible to the naked eye. . .[and] [t]here is also no allegation that the existence of damages was inherently unknowable on [the date upon which the dredging operation was completed]." Id. The court concluded, therefore, that the "plaintiff was, or should have been, on inquiry that he had a potential claim on or before [the date upon which the dredging was completed]." Id. (citing Braude v. United States, 218 Ct. Cl. 270, 273-74 (1978); Japanese War Notes Claimant's Ass'n, Inc. v. United States, 178 Ct. Ct. 630, 634-35 (1967)). Accordingly, the fact that the plaintiff did not discover the damages to his leased oyster bed until three weeks after the project was completed did not preclude the statute of limitations from barring his claim. LaFont, 17 Ct. Cl. at 843.

There is no dispute that Plaintiff was aware in 1999 that the United States was performing work on River Road, which runs across his property, in March and April that year, because he executed a "Rights of Entry" agreement on March 13, 1999. Compl. ¶ 4.3; see also Norman Declaration, ¶ 16 & Ex. F. Reasonable diligence at that time would have revealed the existence of the excavation site on Plaintiff's property. Moreover, the excavation site was first used in 1998 and was plainly visible from the road when Mr. Ingrum bought the property on March 16, 1999. See Hernandez Declaration, ¶ 6. Mr. Ingrum, therefore, should have been on inquiry that material might again be taken from the Candelaria Property in 1999, especially since he did not expressly deny permission to the government to use material for the road when executing the 1999 ROE form, although he easily could have done so. See Ingrum Tr. at 53:5-18; see also Norman Declaration, ¶ 16 & Ex. F.

As was the dredging operation in LaFont, supra, the road work "was an obvious act and one undoubtedly known to plaintiff," the excavation site was "visible to the naked eye," and

"[t]here is also no allegation that the existence of damages was inherently unknowable" in April 1999 when the road work was completed. LaFont, 17 Cl. Ct. at 842. Therefore, like the plaintiff in LaFont, Mr. Ingrum "was, or should have been, on inquiry that he had a potential claim on or before" April 1999. LaFont, 17 Cl. Ct. at 842. Accordingly, Mr. Ingrum's claim accrued in April 1999, and was untimely filed on January 9, 2007.

### D. The Statute of Limitations Cannot Be Equitably Tolled

When the United States filed its February 20, 2007, motion, the question of whether equitable tolling is ever available under 28 U.S.C. § 2501 had not been resolved. On January 8, 2008, however, the Supreme Court put the matter to rest, re-affirming that the statute of limitations under 28 U.S.C. § 2501 is a jurisdictional requirement that cannot be equitably tolled. John R. Sand & Gravel Co., 2008 WL 65445 at *4-*6. In discussing its prior jurisprudence on the subject, the Supreme Court unambiguously stated that "it is not surprising that nearly a decade after the revision [of Section 2501], the Court . . . again repeated that the statute's limitations period was 'jurisdiction[al]' and not susceptible to equitable tolling." Id. at *5. The Supreme Court reaffirmed the "absolute nature of the court of claims limitations statute." Id. at *4. Because 28 U.S.C. § 2501 is jurisdictional, this Court may not "consider whether certain equitable considerations warrant extending [the] limitations period." Id. at *3

Accordingly, equitable tolling is unavailable, and Plaintiff's takings claim must be dismissed as untimely.

## V. CONCLUSION

Plaintiff's claim, if any, accrued no later than April 1999, and expired in April 2005. Because this action was filed more than 19 months after the expiration of the six-year limitations period, Plaintiff's takings claim is time-barred and this action must be dismissed.

Respectfully submitted,

RONALD J. TENPAS
Environment & Natural Resources Division
Assistant Attorney General

/s/ Bruce K. Trauben
BRUCE K. TRAUBEN
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0238 (phone)
(202) 305-0506 (fax)

OF COUNSEL:
CPT. LISA SATTERFIELD
U.S. Army Litigation
901 N. Stuart Street, Suite 400
Arlington, VA 22203
(703) 696-1564

Dated: January 25, 2008