# EXHIBIT 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ROBERT INGRUM )
Plaintiff, )
)
)
vs. ) No. 07-12L
) Hon. Mary Ellen Coster Williams
)
THE UNITED STATES OF AMERICA)
Defendant. )

---

ORAL DEPOSITION OF
ROBERT INGRUM
DECEMBER 10, 2007

---

ORAL DEPOSITION OF ROBERT INGRUM, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on DECEMBER 10, 2007, from 9:50 a.m. to 2:37 p.m., before Shana R. Wise, CSR in and for the State of Texas, reported by method of machine shorthand, at the Law Offices of Minton, Burton, Foster & Collins, 1100 Guadalupe Street, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR THE PLAINTIFF:
Mr. John C. Carsey
MINTON, BURTON, FOSTER & COLLINS
1100 Guadalupe
Austin, Texas 78701
(512) 476-4873
jcarsey@mbfc.com

FOR THE DEFENDANT:
Mr. Bruce K. Trauben
DEPARTMENT OF JUSTICE
601 D Street, NW
Washington, DC 20004
(202) 305-0238
bruce.trauben@usdoj.gov
-AND-
Captain Lisa Satterfield
THE UNITED STATES ARMY



INDEX


| | PAGE |
|---|---|
| APPEARANCES | 2 |
| STIPULATIONS (Attached hereto) | |
| ROBERT INGRUM | |
| EXAMINATION BY MR. TRAUBEN | 5 |
| EXAMINATION BY MR. CARSEY | 133 |
| FURTHER EXAMINATION BY MR. TRAUBEN | 137 |
| CHANGES AND SIGNATURE | 143 |
| REPORTER'S CERTIFICATE | 145 |


EXHIBITS


| NO. | DESCRIPTION | PAGE IDENT. |
|---|---|---|
| 1 | Map | 17 |
| 2 | January 8, 1998 Letter to Mr. Alan Wittenberg from Dan L. Wilkinson, Ph.D. | 33 |
| 3 | Affidavit Regarding Compliance with Contract Obligations and Acceptance of Property | 34 |
| 4 | Earnest Money Contract | 36 |
| 5 | Earnest Money Contract | 38 |
| 6 | Amendment of Contract of Sale | 44 |
| 7 | General Warranty Deed (all cash) | 45 |
| 8 | Survey | 47 |
| 9 | Military Construction, Training and Operations Right-of-Entry Permit | 49 |
| 10 | Photographs | 63 |
| 11 | River Road Site Visit December 4, 2007 | 68 |




EXHIBITS - continued


| NO. | DESCRIPTION | PAGE IDENT. |
|---|---|---|
| 13 | Plaintiff's Responses to Defendant's First Set of Interrogatories and Requests For Production of Documents | 78 |
| 14 | Plaintiff's First Supplemental Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents | 78 |
| 15 | MapQuest Printout | 98 |
| 16 | Phone Records | 102 |
| 17 | Claim for Damage, Injury, or Death | 113 |
| 18 | Letter to The Honorable Pete Gallego | 114 |
| 19 | Affidavit of Robert Ingrum | 128 |


*-*-*-*-*



ROBERT INGRUM,
having been first duly sworn, testified as follows:
EXAMINATION
QUESTIONS BY MR. TRAUBEN:
Q. Could you please state your full name for the record.
A. It's Robert P., Porter, Ingrum, I-n-g-r-u-m.
Q. For the record, my name is Bruce Trauben. I represent The United States in the action of Robert Ingrum versus the United States. And we're here to take your deposition, as you know. I'll go over just a few ground rules. The idea for the proceedings today is that I'll ask you questions. And hopefully you can provide answers to the best of your recollection. If you don't recall something, just say so. That's fine.
A. Okay.
Q. When I ask you a question and you give a response, we'll assume that you understood the question.
A. Okay.
Q. And if you don't understand the question, please ask -- you know, just let me know and I'll try and rephrase it.
A. Okay.
Q. We have a court reporter here who is taking down every word that is being said today, which means that we have to respond in words verbally. Nods of the head, things like

Q. Did you have property surveyed, normally, before purchasing it?
A. Yes.
Q. Before you bought the property near Candelaria, Texas, this property that we're talking about that's part of the lawsuit, was an appraisal done of that property before you bought it?
A. No, it was not.
Q. Was the price per acre based on word of mouth?
A. I'm sure it was.
Q. Did you have -- at that time, in 1998 or 1999, did you have a pretty good idea of what property was going for per acre?
A. Not really. That country out there is -- is very unusual, very different from anything that I was used to. And the visual aspects of it are -- are overwhelming, to say the least.
Q. So it's -- specifically with respect to the Candelaria property, how did you go about determining the price per acre at that time?
A. Well, it -- you know, there were 36 heirs involved. And it was a long negotiation, to say the least. I would guess two to three years.
Q. And the seller suggested the price per acre?
A. Oh, we had many, many suggestions back and forth.



It was a -- it was a long, drawn-out, contentious, if that's the word, right word, negotiation.
Q. At the time, how did -- did you convince yourself at the time that the price per acre was fair?
A. You know, I didn't know. I just -- I knew it was just a beautiful piece of property. And I guess I fell in love with it. And...
Q. Do you know what the price per acre was?
A. It -- John refreshed my memory this morning. I didn't remember. But he refreshed my memory this morning and said that it was $98,000.
Q. And the price per acre?
A. Oh, the price per acre. Well, I'd just have to divide 98,000 by 3300. I'd have to see what that amounted to.
Q. So at the time that you bought the property, did you intend to sell it quickly for profit?
A. I wanted to sell part of it. Yes, I did. I wanted to sell part of it for profit.
Q. Was there an interested buyer at that time?
A. There was.
Q. Who was that person?
A. I don't remember her name. It was -- that's been nine -- eight, nine years ago.
Q. Do you recall what part that person was interested in buying?



A. Oh, I don't know that she -- probably -- no, I don't.
Q. Do you know whether it involved the parcel from which there's an allegation that the government took soil material from a borrow pit?
A. No, I don't -- I don't know. I don't remember. I don't know whether that was...
Q. When did you first learn about this property near Candelaria, Texas?
A. Probably a couple years, maybe three years before that. I'd heard there was some property for sale down there, but I can't tell you -- I don't remember who -- who actually told me about it.
Q. That was approximately 1996, 1997?
A. Just a guess.
Q. Most likely by word of mouth?
A. Word of mouth.
Q. Did you attend realtor events, such as conferences, things like that?
A. No, I did not.
Q. Were you a member of any real estate organization?
A. I was during the time that I had -- that I had an active license.
Q. What organization was that?
A. Austin Board of Realtors.



MR. TRAUBEN: Have this marked as Exhibit 1.
(Exhibit 1 marked.)
Q. (BY MR. TRAUBEN) What's been marked as Exhibit 1 is a map of southwest Texas. Do you recognize the area depicted?
A. Yes, I do.
Q. There's an arrow pointing to a square, and underneath it says 3300-acre ranch. Is that your writing?
A. Yes.
Q. And you drew the square?
A. Yes, I did.
Q. And it's just northwest, maybe about a mile from Candelaria?
A. Right.
Q. So during our conversation today, when we speak about the property in Candelaria or near Candelaria, we're talking about the parcel of property that's depicted on the map?
A. Yes.
Q. When did you first visit the property?
A. Oh, in -- I would say with two to three years prior to -- to the property being sold.
Q. Prior to buying it?
A. Yes.
Q. Did you visit it specifically because you were interested in buying it?

A. Yes.
Q. Did you ever use the property recreational -- recreationally?
A. A little bit. In the extent that I would camp out there, yes.
Q. Did you camp out there before buying it?
A. No, I did not. I don't think -- I don't remember -- I don't think so. You know, the -- the two years of negotiations back and forth, one area you -- you know, back and forth just -- oh, it just seems like a long -- a long -- did I actually go out there and camp out before -- during negotiations? I don't remember. I don't think that I did, but it's possible I could have.
Q. When you were interested -- first became interested in buying the property near Candelaria, what use was being made of the property at that time?
A. Nothing. Nothing.
Q. Were there any lessees?
A. I'm sure there were -- well, actually, there was -- there was a fellow that had been out there for year -- I mean, like 30, 40, 50 years. I don't remember his -- remember his name. But he had a few head of cattle out there. But a very few.
Q. A few head of cattle?
A. Yes. He had been on the property. I don't think he



ever paid anybody any money. I think he just ran a few head of cattle on it.
Q. Do you know that individual's name?
A. No, I don't.
Q. Did anybody lease the property from you after you bought it?
A. They did, yes.
Q. Who leased it from you after you purchased it?
A. A fellow named -- well, I say he leases it. He pays me occasionally. He doesn't pay me on a regular basis. Antenacio is -- actually is his first name. I actually don't know his last name. Antenacio. But he doesn't pay regularly. You wouldn't want him to lease anything from you.
Q. With his payment record?
A. That's right.
Q. Do you know --
A. If he ever wants to lease anything from you, call me and I'll send you a copy of his -- of his payment record.
Q. Was there a written lease with Antenacio?
A. No. I don't think so, no.
Q. Do you know for what purpose he uses the property?
A. He has -- runs a few head of cattle on it. Not many.
Q. A few head of cattle. Does that mean less than 50?
A. Oh, yes. Maybe -- I'm going to guess ten or 15.



You know, it's funny. This property is not legal -- is not fenced. And they run cattle on unfenced property. And then at the end of the year, I don't know how they -- how they do this, you know. But they -- well, for one thing, they all know each other. You know, they've all -- they all -- they -- you know, they've all lived there for many generations. And it's funny how they -- how they do that. But, you know, the -- if your cattle drift up the river 20 miles, they -- they seem to be able to -- to handle that.
Q. When you say they, who do you mean?
A. Well, the other people in the -- in that area. The other -- the other -- I call them natives, for lack of a better word. Native -- native to that -- native to that part of the world.
Q. Do people cross between the Mexican side and the U.S. side of the Rio Grande on a regular basis?
A. Yes, they do. There's a bridge there. Little bridge. A little -- like you see in the jungle movies.
Q. And just for the record, the property is located adjacent to the Rio Grande River?
A. Yes, it is.
Q. So do ranchers run cattle on your property and -- to your knowledge, and not pay?
A. Oh, yes. Yes. That's...
Q. And you don't mind that they do that?



A. Well, there's not much I can do about it, because I'm not out there very often. And they -- if they make a little money off of it, good for them. They're very nice people. It's just a different -- a different world. Very family-oriented.
Q. Do you remember your first visit to the property?
A. No, I don't.
Q. Before you bought the property, about how many times did you visit total?
A. Oh, you mean before the property actually closed?
Q. Yes.
A. Many times.
Q. Is that approximately ten times?
A. Oh, no. More than that. I'd say 20 or 30 times.
Q. And what -- approximately what years are we talking about 20 or 30 times that you visited?
A. Probably '97, '98. In that area, '97, '98.
Q. Did you typically drive the same route to get there?
A. Yes.
Q. What kind of a vehicle did you use, if any, to traverse the property when you visited?
A. I have a four-wheel drive vehicle.
Q. What make?
A. I would rent a -- I have a pickup, but it's not four-wheel drive. So I would just -- I would rent a --

is today?
A. No, I don't.
Q. Do you think the price per acre has increased or decreased since you bought it?
A. Oh, I'm sure it's increased.
Q. During those 20 or 30 visits before you closed on the property, were there times when the level of the Rio Grande River was over the banks?
A. Yes. It -- it floods, I think, every year.
Q. Is there a particular time of year when it floods?
A. Not -- not that I know of.
Q. And when the Rio Grande floods, does it wash out part of the road?
A. I've never actually -- I haven't seen that happen, where it washed out the road. I have not seen that happen.
Q. Are there creeks that run across the road?
A. There are dry -- what they call dry creeks.
Q. If there's a rainy period, are those creeks then flowing with water?
A. Yes.
Q. And the water flows across the road?
A. I've never actually seen that happen. I've never been out there when that happens, but I -- I believe it probably does happen.
Q. Have you been there before you bought it -- focusing



on that period before you bought it, were there times when the road was washed out?
A. I never -- no. I never -- that never -- I was never out there prior to buying it when I couldn't drive the full three or -- three -- about three miles. Not quite three miles.
Q. In the four-wheel drive?
A. Yes. Uh-huh.
Q. After acquiring the property, would you also visit in a four-wheel drive?
A. Yes.
Q. Can you approach your property from the north?
A. Probably. But I never have.
Q. Why not?
A. Because it's much longer.
Q. Instead of going through Candelaria, then, if you're approaching from the north, what town would you go through?
A. I believe now that you would turn off at Valentine, which is a little town west of Marfa.
Q. Turning off of Route 90?
A. You -- you -- yes. You would take 90 -- you would take 90 west of Marfa. And about 20 or 30 miles, there's a little town called Valentine. And somewhere along in there, maybe not -- maybe five miles on either side -- oh, actually, here's Valentine right up here. Somewhere along in there, there would be a road that would go down to river -- to the



river road.
Q. Is that a paved road?
A. No, it's not.
Q. Before you bought the property, did you -- how much of it had you seen before you bought it?
A. I'd seen all of it long -- along the river road.
Q. Did you go inland, away from the river road?
A. No. It -- no, I did not.
Q. Is the majority of the property located out of view from the river road?
A. It seems like you can see the -- you know, I mean, you can see the mountains from -- from river road. There's a good bit of it that -- that -- that's out of view, but there's a good bit of it that -- that you can see.
Q. From the river road, then, the -- is it fair to say that the property increases in elevation and so that the majority of the property is higher in elevation than --
A. Yes.
Q. -- what you can see from the river road?
A. Yes.
Q. Is it -- would you say that the terrain is hilly?
A. Yes.
Q. Did you ever fly over the property?
A. Yes.
Q. And you flew over it before buying it?



A. I don't remember that. I don't remember whether I did or not. But I did -- I have flown over it in a small Piper -- small, like a 172 or something like that.
Q. Are you a pilot?
A. No, I'm not.
Q. And how did it come about that you flew over the property?
A. I guess I just wanted to look at it.
Q. So was that after you bought the property?
A. I'm sure it was. I don't remember. I really don't remember, but I -- I think it was afterwards.
Q. About how many years after?
A. Oh, probably -- it was pretty close to about the time that I -- I really -- that I -- that it -- that it actually sold. Might have been a little time -- a little bit before. Might have been a little bit afterwards. I'm -- I'm not sure.
Q. Around the time that you were closing on the purchase?
A. Right. Somewhere along in there.
Q. Did you take any pictures?
A. No, I did not. I'll give you the name of the bush pilot so you won't -- you don't want to -- you don't want to go over there with him.
Q. It was a rough flight?





Electronically signed by Shana Wise (401-340-211-9479) 1b0420e4-5c40-48d7-b2d5-406f2d5221a3

A. Oh, he was from -- he had -- migrated down from Alaska. And he'd been flying, been a bush country pilot up in -- when I pulled up to the Marfa airport, I think I was the first customer he had had in a long time.
Q. Did you have to pre-arrange the flight or could you just show up at the Marfa airport?
A. I just showed up and asked if there was anybody that would...
Q. Take you for a flight?
A. Take me for a ride.
Q. Before you bought the property, did you know that the military was doing work on the river road in 1998?
A. You know, I believe that I -- just about the time that it -- that it closed, I believe that shortly thereafter, I got a -- a letter, a right of -- a right of -- a request to sign a right-of-entry letter. I believe right along in that time is when I got that letter. Right along about somewhere -- I don't know whether it was before or -- or after. But right along in that little time frame I got a letter with -- it was a right-of-entry letter.
Q. What about the year previous, in 1998, before you entered into any contract on the property? Did you know that the military was working on the road?
A. You know, I don't remember that. I just know -- I do know that I got a letter -- that I got this right-of-entry



request somewhere in that little area, somewhere, maybe a month or two before. Maybe a month or two afterwards. I don't remember.
Q. Month or two before or after closing?
A. Closing. Somewhere along in there. And...
Q. And you closed in 1999?
A. I'd have to check the records.
Q. Okay. We're going to do that.
Before you closed - and the record will show it was in 1999; I'll represent that to you - did the sellers provide any documentation to you regarding the property?
A. You know, my recollection of this was that it was -- that we had at least two years of contentious conversation with this. The first lawyer that we dealt with that was representing the buyers died. He was a man in his late 80s. I don't remember his name. But I remember that he died. So we had to go through that. And they had to agree on another -- on another -- that they had -- another lawyer. And this was a fine old gentleman that I even forget where he was from. But he was very congenial. And then he died. And he'd been -- he'd known about the -- he had been -- he had known about the property for all of his life. You know, I mean, he'd been -- I guess you would say he was kind of a family -- the family attorney.
Q. The congenial attorney who passed away?



A. Yes.
Q. The first lawyer?
A. The first lawyer. I remember his first name was Ben. And he knew all about it. He'd -- like I say, he'd been -- I think he had actually represented the original owner, the owner that had the 36 heirs.
Q. So the -- Chanosky?
A. Chanosky. That was the original owner. And -- I'm sorry. I forgot your -- Ben was really a terrific guy. That's what I was thinking about, old Ben. But he was -- when he left -- and then the other one that took over that I don't remember. The other one was nice, too.
Q. Alan Wittenberg?
A. That's -- yes. Alan was nice, too.
Q. Did Alan provide any documents to you about the property?
A. Oh, I'm sure he did. Both of them did. And Alan might have worked -- I don't remember. I don't remember.
Q. Do you recall, did Alan -- or I believe it would have been Alan Wittenberg. Did he send you any environmental documents about the property that you recall?
A. I don't -- I don't think so.
Q. And you bought the property as is?
A. Yes.
Q. And what does that mean, as is?



A. To me, it means that you just buy it for -- you buy for -- you buy it on your -- on your own inspection, that you don't expect -- you don't expect them to have any obligation to -- to fix anything.
Q. So you bought it with any defects or faults?
A. Right.
MR. TRAUBEN: Off the record a second.
(OFF THE RECORD.)
(Exhibit 2 marked.)
Q. (BY MR. TRAUBEN) Mr. Ingrum, you've been handed what the reporter has marked as Exhibit 2 to your deposition. It's a January 8, 1998 letter to Alan Wittenberg from Dan Wilkinson, who is with Geo-Marine. And he was forwarding an environmental assessment, which is a lengthy document. And not all of it is attached. But I -- I did attach the cover sheets to the environmental assessment that he was forwarding.
Can you take a look? And also look at the next pages. And the question is whether you were -- this helps refresh your recollection of whether or not you were provided a copy of an environmental assessment before you closed on the purchase of the property.
A. I've never seen this, to the best of my recollection.
Q. Okay. We can set that aside then.
Does the county own the river road?





Electronically signed by Shana Wise (401-340-211-9479) 1b0420e4-5c40-48d7-b2d5-406f2d5221a3

A. Yes.
Q. -- depicted in Exhibit 1?
A. Right.
Q. If you look at the fourth page of the earnest money contract - it's page six of 13 of the fax - paragraph 11.
A. Okay.
Q. You see a reference there to Abel Telez, T-e-l-e-z?
A. Yes.
Q. Is he the lessor?
A. He -- well, he was -- when I came along, he had been -- he had been -- he had run livestock on that ranch for years and years and years. He was an older gentleman. But he never paid anybody anything. He never -- nobody ever got any money out of him.
Q. Did he continue to use the property after you bought it?
A. I suppose he did.
Q. Do you know where he is today?
A. No, I don't. I doubt that he's still alive. He was in his late 70s when -- he had been out there for 30, 40 years. And I tried to get money out of him and never was able to. Once or twice. And...
Q. How did you communicate with him?
A. Well, on that -- he lived in the little town of -- not can -- Ruidosa. There's another little town near there. I



believe that's where he lived.
Q. Did you send him mail? Did you have an address for him?
A. No. No. I just asked -- asked somebody, where does Mr. Telez live. And they would say that he lived in Ruidosa, R-u-i-d-o-s-a. That's a little town about 20 or 30 -- about 15 miles from Candelaria. And I stopped and talked to him one time. And he -- he couldn't -- he couldn't -- couldn't pay me anything. So that was the end of that.
Q. Did you ever speak with him again after that?
A. I don't -- no. I just met him one time.
Q. Did you ever speak with him on the telephone?
A. No, I did not.
Q. And just above that paragraph, paragraph ten --
A. Yes.
Q. -- it says possession. It says, the possession of the property shall be delivered to buyer at closing. Correct?
A. Yes.
Q. So you took possession after closing?
A. At closing.
Q. Okay. Do you know who paid any property taxes in 1998?
A. No, I don't.
Q. Did you?
A. No. Let's see. Let's see. I -- it was closed in



March of '99? Is that correct?
Q. Yes. We'll see that.
A. So no, I didn't pay any property taxes in '98.
Q. Do you -- did you retain a copy of the earnest money contract in your files?
A. No, I did not. I was looking for it the other day and -- John had asked me to see if I could find it. And I couldn't find anything.
(Exhibit 6 marked.)
Q. You've been handed what the reporter has marked as Exhibit 6. It's entitled amendment of contract of sale. And it's dated, at the bottom, March 16, 1999.
Mr. Ingrum, is that your signature in the lower right?
A. Yes.
Q. And that's your wife's signature beneath yours?
A. Yes, it is.
Q. And there was an adjustment in the purchase price for the Candelaria property at the time of closing?
A. Yes.
Q. And do you know why the price was adjusted?
A. Because I -- we didn't want the vacant lot. The vacant lot was not worth what it was -- there were more taxes owed -- as I remember, there were more taxes owed on the vacant lot than it was worth.



Q. Okay. And that was being deleted. And that's up above.
A. Right.
Q. And also, had a survey been done of the Candelaria property by this time?
A. It was -- the survey was done somewhere right along in there.
Q. Okay.
A. And normally it would have been done -- it would have been done before the -- the closing.
Q. Okay.
A. Normally it would be. So I'm assuming that it was.
Q. But the price per acre didn't change?
A. No.
Q. All right. You can go to the next -- our next...
(Exhibit 7 marked.)
Q. Is this Exhibit 7 -- do you recognize what Exhibit 7 is, actually?
A. I recognize -- as I see, that it's a -- that it's a -- a general warranty deed.
Q. Did you receive this at the time of closing?
A. Is it -- does it show that I signed this or...
Q. Well, in the -- is the normal practice that the recipient of a deed signs or --
A. No.

Q. -- the guarantor?
A. No. No. The recipient would not sign it, no.
Q. The guarantor would sign the deed --
A. The guarantor would sign.
Q. And is this signed by the guarantor?
A. Yes, it is.
Q. And this is the deed conveying the Candelaria property to you and to your wife?
A. Yes. It appears to be that.
Q. And did you retain a copy of this in your records?
A. I did not.
Q. This is Bates numbered D, as in David, 21 through 26. Do you know whether you made a copy of this available to your attorney?
A. This -- of this deed?
Q. Yes.
A. No, I did not. I wasn't able to find any papers relating to...
Q. Did you have the deed recorded?
A. Oh, yes. It was recorded.
Q. Did you do that or did --
A. No.
Q. -- the seller?
A. The title company did.
Q. The title company. Rattikin?



A. Rattikin. I assume that they did. You know, I want to check on it, but I -- I assume that they did.
Q. During that -- the time period after you entered into the earnest money contract and -- and then closing, did you continue to visit the property, as we had discussed previously?
A. Yes. Uh-huh.
Q. And during that time period, were you able to traverse the river road?
A. Yes, I was. I was able to traverse the river road until the Corps of Engineers showed up out there, whenever that period was.
Q. The date at the top of the deed, March 16, 1999, does that refresh your recollection as to the date of the closing?
A. It does not. But I -- I have no reason to believe that that's not correct.
(Exhibit 8 marked.)
Q. For the record, you've been handed what's been marked as Exhibit 8.
MR. TRAUBEN: And I'm -- I only have two copies.
MR. CARSEY: Okay. That's fine.
MR. TRAUBEN: This actually -- if you want to see the oversized -- I didn't want to --



MR. CARSEY: I've -- I've seen that. That's fine.
MR. TRAUBEN: -- have the oversized document entered into the record because it was -- cost more to have it copied.
Q. (BY MR. TRAUBEN) Do you recognize what this is?
A. I certainly do.
Q. And is that your handwriting upside down at the bottom?
A. It actually looks like my handwriting.
Q. And then in the survey number 16, survey section 16, there's a note, a handwritten note. Is that your handwriting?
A. Oh...
Q. There's a square and a note underneath, gravel pit created by Corps of Engineers. You see where I'm --
A. Yes, I see that.
Q. Is that your writing?
A. I'm -- I'm quite sure it is.
Q. And did I read that correctly? It's a little faint. I just want to make sure we see the same thing.
A. Yes. Gravel pit created by Corps of Engineers.
Q. And then also towards the bottom of the survey section number 14, there's a word in quotes, bog --
A. Bog.
Q. -- double underlined.



A. That looks like -- I'm sure that's mine. That -- that looks like my writing.
Q. Okay. And is this the survey that was prepared in advance of closing?
A. Yes, it is.
Q. Where you wrote in bog, that area down below --
A. Yes.
Q. -- does the river run close to the road at that point?
A. It would be -- let me -- actually, I'm going to have to look at it and see. It shows that it does. It looks -- let me think here. It seems like the river would be about 30 or 40 feet, just a guess, from there.
Q. Any creeks run through that area?
A. I don't think -- no. I don't think so.
Q. And I have the full-sized version of Exhibit 8 if you need to see it.
A. Okay. No. That's okay.
Q. I didn't want to put it into the record.
A. Okay.
(Exhibit 9 marked.)
Q. And, Mr. Ingrum, you've been handed what has been marked as Exhibit 9 to your deposition. And for the record, it has Bates numbers US00565 through 00570. And earlier in your deposition you referred to a right-of-entry. Is this a

Page 50

photocopy of the right-of-entry that --
A. Yes. This looks like it does, yes.
Q. And if you look at the second page, is that your signature?
A. Yes, it is.
Q. And you signed this on March 13, 1999?
A. Yes.
Q. Just a few days before closing?
A. Uh-huh.
Q. Is that a yes?
A. Well, let's see here. That appears to be right, yes.
Q. If you look at the page that's marked 568 in the lower right-hand corner.
A. 568.
Q. 568. It's dated February 26th, 1999. You see where it says, permission granted to do road work on the property in Presidio County, Texas?
A. 568. Okay. Yes.
Q. Okay. Do you recall this?
A. I don't recall it, but that -- that appears to be my signature.
Q. That's your signature, and that's your wife's signature below?
A. Yes. Uh-huh.

Page 51

Q. And did you mail that note to Mr. Wittenberg?
A. I'm sure that I did. I don't remember doing that, but I -- I'm sure that I did.
Q. Did you --
A. Well, I'm not sure that I did. I -- I don't -- I just don't remember.
Q. Well, let me ask you. What --
A. Oh.
Q. Is there a fax line or something that helps --
A. Yeah. There's a fax -- yeah.
Q. And what does that tell you?
A. The fax?
Q. Yes.
A. That I faxed it to him on that date.
Q. Did you sign the right-of-entry around that same time and postdate it, anticipating the date of closing?
A. I don't understand that question.
Q. Well, the right-of-entry -- I'm just wondering whether you signed the right-of-entry in February 1999 and -- and anticipating that you would have closed on March 15th. And so you wrote in -- so you dated the right-of-entry March 13th. Or did you sign -- you think you signed it on the date that it's indicated on page two? Is that still not clear?
A. That really isn't clear. And I -- I really would --
Q. Okay.

Page 52

A. I wouldn't remember that.
Q. If you look at the top of the first page it says, March 12th, 1999, Holiday Inn, Uvalde.
A. Right.
Q. Did -- did you fax this document from the Holiday Inn in Uvalde?
A. Yes, I did. I used their fax machine.
Q. So you actually faxed this a day before -- so does that indicate to you that you may have signed this actually before the closing?
A. Yes, it does.
Q. Was the closing held up, to your recollection?
A. I don't remember that.
Q. In real estate, does that often happen, where the closing may occur a few days after it was initially set?
A. I think it probably is.
Q. Well, when you wrote the note to Mr. Wittenberg, you think you were forwarding the signed right-of-entry?
A. To him? I would think that I -- I would think that that's true.
Q. Okay. And if you look at the second page -- well, let me back up before I ask this.
When you sent it to Mr. Wittenberg, was it your understanding that he would provide it to the military?
A. I would think that he -- I would think that that's

Page 53

true, yes.
Q. You didn't deal directly with the military; you were communicating through Mr. Wittenberg?
A. I think that's probably -- yes.
Q. Okay. If you look on the second page, above the signature of paragraph six, it says, the owner does, slash, does not grant the government the right to use any buildings, timber, or any other products of the land.
A. I see that.
Q. Did you circle either does or does not?
A. I can't -- it looks to me like there wasn't anything.
Q. Do you -- you left that blank?
A. That's what it looks like to me, that it was left blank.
Q. And you have not seen a copy of this where it's -- one is circled or crossed out?
A. No, I have not.
MR. CARSEY: Let me -- let me ask -- I want to ask you a question.
MR. TRAUBEN: Okay.
(OFF THE RECORD.)
Q. (BY MR. TRAUBEN) Mr. Ingrum, you've had to leave the room to speak with counsel. Is there any part of your testimony that you need to correct?

A. Yes. I want to correct this on this -- on this handwritten letter on the 26th of February, I sent that to -- after consulting with John, he wanted me to make this clear, that this was evidently sent to him on the 26th of February and that that was not adequate. And that if you'll go back to the -- to the -- the -- the actual printed form, it states that on -- that the Mail Center USA faxed this to me on March 12th and that I, in turn, faxed it on May 12th from the Holiday Inn in Uvalde -- faxed it back to them from the -- the regular printed form.

THE WITNESS: Is that what we're --

MR. CARSEY: That's --

THE WITNESS: -- that -- that situation?

MR. CARSEY: If that's what your recollection is.

THE WITNESS: Okay.

Q. (BY MR. TRAUBEN) And did you date it March 13th on March 12th, anticipating closing --

A. Yes.

Q. -- on --

A. Right.

Q. -- the property --

A. Right. Yes.

Q. And they -- it was held up a few days?

A. Yes. Uh-huh.



Q. Okay. So when you sent the note to Mr. Wittenberg in February '99, did you expect that he would then inform the government that they had your approval --

A. Yes. I was communicating. I did not have any -- now that we're talking about it, I did not have any communication with the government.

Q. Directly?

A. Directly. It was all through Mr. Wittenberg.

Again, this is something that happened eight, nine years ago. And this is my recollection, is that I went through Mr. Wittenberg.

Q. That's fine.

A. I just don't remember whether I actually -- I would have no reason to. I just don't remember. But my recollection is that I went through Mr. Wittenberg.

Q. And you were -- you don't remember, you're saying, having direct contact with government --

A. Military.

Q. -- military?

A. I don't remember direct contact with them.

Q. Okay. Can you do me a favor and go back to Exhibit 5? There should be one in front of you with a sticker on it. That's the 13-page fax that we were looking at.

A. Okay. Let's see. This is it right here. Okay.

Q. We'll get those straightened out later.



Looking at the Exhibit 5, if you could turn to the sixth page of the fax, which is page four of the earnest money contract.

A. The sixth page...

Q. Sixth page of the fax, page four of the contract.

A. Okay.

Q. Enumerated paragraph nine, titled closing.

A. Yes.

Q. This paragraph says that the closing of the sale shall be within 90 days of the execution of this agreement or within seven days after objections to title have been cured, whichever is the later.

The closing did not occur within 90 days. Is that correct?

A. This was May 21st, 1998. No, it did not.

Q. When -- or do you know why the closing did not occur within 90 days --

A. We had four years. Now that I can figure 1996 has come up, we had at least four years of a very contentious -- again, 36 heirs. You can just let your mind run on that one. And it was a very contentious closing that went on and on and on. And, I mean, a lot of the details, I simply don't remember. But I do know that if it -- anyway, that's...

Q. So that's -- that was -- the cause of delay was that there was some dissension among the heirs?



A. We just -- there was just everything in the world, everything that you could imagine -- some argument -- and again, we had a death. The old family lawyer died at some point in time. And I don't remember exactly when that was. But we went through that. And that certainly delayed things a period -- long period of time.

Q. Was that David Ritzwoller?

A. No. No. It was Ben...

MR. CARSEY: Gilbert.

A. Ben Gilbert.

Q. (BY MR. TRAUBEN) That was before the May '98 contract, though, that he had passed away?

A. I'm pretty sure it was, yes.

Q. Was the contention between you and the sellers or was it among the sellers?

A. I think it was basically among the sellers. I mean, we obviously argued about everything in the world. That's just -- you know, just a typical -- not a typical. But it was -- it was -- it was quite a bit of arguing going on. And...

Q. Did you have representation throughout this process or did you handle it yourself?

A. I handled it myself.

Q. Because of your experience in real estate?

A. Well, that might have been -- might have been the





Electronically signed by Shana Wise (401-340-211-9479) 1b0420e4-5c40-48d7-b2d5-406f2d5221a3

problem.
Q. But you -- you were comfortable in handling it yourself because of your experience?
A. I thought. Yes. I thought I was. But...
Q. Well, after April 1999, how many times have you visited the property?
A. Well, I'm trying to think. They were out there working on that road. They ended sometime -- I think they -- they left sometime in May of that year. I'm not sure. But I think they left the latter part of April or the -- or sometime in May. And when they left, I couldn't -- the road was -- they had dug a -- dug a lake. That's what they'd done. They dug a lake, what we called the bog. And -- and when it rained or when -- and I couldn't get -- when it rained or when the river came up, you know, it would go back down right away, but it would fill the bog up -- or fill the lake up, and you couldn't -- you could couldn't access the property.
So it wasn't many -- for instance, this year, here we are in the middle of -- of December, and that -- that road has been closed all year. Now, I think -- so it's drying up. It's possible that -- anyway. Anyway. To answer your question, I don't remember how many times. But I have called -- I bet I've talked to Terry -- oh, the border patrol guy.
Q. Terry Norman?



A. Terry Norman, who is agent in charge out there. I've talked to him many, many, many times in the last few years. I mean, I'm sure he thought I was some kind of nut to ask him, is that road accessible. And he invariably said, no, it's not.
Q. Did you also speak with somebody by the name of Bert Hernandez?
A. What was the first name?
Q. Bert or Humberto?
A. Bert. Humberto. Yes. Humberto was another one. Humberto, Terry, Mr. Furgeson, who is from Brackettville, a little town near where I was raised. Humberto. Humberto was the -- Humberto was stuck out there and had to -- you know, he got stuck in that bog and had to walk back to Candelaria. Once you've done that, once you've walked back to -- from that bog, it's a -- it kind of slows you up. But Terry Newman -- Norman.
Q. Norman.
A. I've talked to him more than anybody else. But that's because he's been there the most. But the rest of them -- Humberto was there a lot, but I don't -- but then -- then he was transferred over to Arizona on a TDY or something, temporary duty. And so I lost track with him. And then Terry retired. And, you know, they've got Marfa, Alpine, the little station -- substation south of Marfa by five miles. You know, all those guys. I mean, I've called and called and called.



And to make that long trip out there and then the -- and then to know that the road is -- that you can't -- you have no access.
But the answer to your question is I don't know how many times that I've been out there, but it's been -- I've made a lot of trips out there, but never -- well, not a lot of trips out there. I've called a lot. And when they told me the road was not -- not open, then I -- of course I wouldn't go out there.
Q. Have you had any use of the property since 1999?
A. Not really. I leased it to a wildlife photographer two or three years ago. And I got a guy there in -- in Candelaria who had a four-wheeler, and we went out there and got to try to get a -- go around the bog. And we got it stuck and had to walk back to Candelaria.
Q. Where did you get stuck?
A. In the bog. We tried to go around -- we went into the bog and almost got stuck, and got out. And then we -- when we tried to go around the bog -- and there's a little -- some kind of a soft spot right next to it, and we got stuck there.
Q. Are you aware of -- there's a creek called Capote Creek?
A. Yes. Yes, I know where Capote Creek is.
Q. And that's north of Candelaria?
A. Right.



Q. And that's --
A. It's between my property and Candelaria.
Q. Between your property and Candelaria?
A. It's about -- this property that I've got is about four miles from Candelaria. Capote Creek is about halfway. It's about -- about two miles from Candelaria.
Q. And you have to cross Capote Creek?
A. Yes.
Q. You drive through the water?
A. Right. That's got a firm bottom. It's not like -- I was -- I crossed -- I was there a week ago. And the -- there was -- there was water -- water in the creek bed, but it's got a firm bottom. And I crossed that in a pickup, no problem. Not in -- not in four-wheel drive.
Q. When were you last there?
A. About a week ago.
Q. Roughly December 2nd or December 3rd?
A. I was there Sunday -- Sunday a week ago.
Q. Approximately - I don't have a calendar - December 1st?
A. December 1st. Whatever that -- Sunday a week ago, I was there.
Q. Or the -- yeah.
(SOTTO VOCE DISCUSSION.)
Q. (BY MR. TRAUBEN) December 2nd. I've been





Electronically signed by Shana Wise (401-340-211-9479) 1b0420e4-5c40-48d7-b2d5-406f2d5221a3

MR. CARSEY: Where is that?
THE WITNESS: I had it this morning.
Q. (BY MR. TRAUBEN) Well, maybe during a break --
A. Okay. Okay.
Q. -- we can work out additional documents.
A. Okay.
Q. But...
A. But you -- you have -- I sent -- you have copies of those pictures, also. There's just one other -- it showed the -- anyway.
MR. CARSEY: You took this a month ago. And he doesn't have copies of it.
THE WITNESS: Okay.
MR. CARSEY: Because I don't have copies of it. Because I didn't know you took them.
THE WITNESS: Okay. Okay.
Q. (BY MR. TRAUBEN) Okay. Going back to the picture of the truck in D12. Do you know how long that truck had been there?
A. No, I don't.
Q. Do you know the circumstances of how the truck came to be there?
A. No, I don't.
Q. Let's look at D13.
A. Okay.



Q. Where was this picture taken?
A. That was taken -- this was taken in 2005. I was out there early in 2005. That's when I took the picture. I walked back -- it was -- it was close to dusk. I walked back there in 2000 -- early in 2005. January or February.
Q. Did you camp out there that night?
A. No, I didn't.
Q. And where was it taken?
A. This was in front of the -- of the large gravel pit. There's several others, but this is the large one.
Q. Is this the gravel pit that you were complaining about?
A. Yes. One of them. Yes.
Q. You're complaining about more than one pit?
A. Well, there are several pits out there. I mean, there -- there are several -- but this is the one I was complaining about, yes. But there are other small pits where they took gravel, road material, whatever you want to call it.
Q. And specifically, where on your property is this pit located?
A. This is about halfway. Now, the latter part of this month, I'm going to take an appraiser out there with a GPS and, you know, hopefully it -- if we can get back there -- we're going to go out there one way or the other, if we have to -- anyway, we're going to go out there with a GPS and do a



regular, formal appraisal of this. This fellow does a lot of work for the Texas Highway Department. So he has been in the business 37 years. So he has a lot of experience along this line. And we will locate the big pit and the several other smaller pits with a GPS location.
Q. You did not do that before filing suit?
A. Before...
Q. Bringing this lawsuit.
A. No. No, I did not.
MR. TRAUBEN: I'll have this marked.
(Exhibit 11 marked.)
Q. (BY MR. TRAUBEN) Mr. Ingrum, what's been marked as Exhibit 11 is titled river road site visit December 4, 2007. And I'll represent to you that these pictures and this map were prepared by the U.S. Border Patrol. And they visited the property on December 4, 2007. And first let's look at the map --
A. Okay.
Q. -- which is the second page of the exhibit.
You see where there's a red flag marked cable?
A. Yes.
Q. Looking at this map, can you identify where your property begins? If you want to take a pen and go ahead and mark approximately where your property begins.
A. These two -- they call these the twin -- the twin



sisters, these -- these two mountain peeks right here on the right. Right -- these are called the twin sisters right here. My fence line -- the property line goes straight up like that. Now, the fence line, which starts --
Q. Does that line show up? Or do you need a better pen?
A. No. I can do that. The -- the property line is -- goes up like that. It splits that. You want me to sketch the whole thing out?
Q. Feel free. Yes. Please.
A. Okay. Now, the fence line goes up here. And then it -- then it skirts rather than going on top of the -- over the top -- it -- on the -- on the topo map, it will show, if you have a topo map. It will show that it goes around -- not that one. That's just a -- well, is that a topo map? It may be. Let me see. Yeah, this is a topo map.
MR. TRAUBEN: Okay. Why don't we have this marked as Exhibit 12.
A. Well, this is -- yeah, this is -- this is the -- this is -- that's the job. That's the way it is. Although the fence line goes around this. You can actually see it around here.
Q. (BY MR. TRAUBEN) Okay. We -- first let's have this marked.
A. Okay.

Page 74

bypass.
Q. And if I go --
A. This is one of the most beautiful spots in Presidio County right here where this -- this picture on the left -- it doesn't show the real pretty water. But the water is gorgeous right through there.
Q. You're talking about that area around the cable, near the cable --
A. Right. Right.
Q. Let's go in to - one, two - six pages.
A. Okay.
Q. Where it's -- the narrative of the border patrol says, as we walked along, we passed this abandoned truck that's on the left.
MR. CARSEY: We're here.
A. Okay. Right. Okay. There's the abandoned truck.
Q. (BY MR. TRAUBEN) Is that -- is this the same area that is depicted in exhibit -- Exhibit 10?
A. Right.
Q. Where the --
A. Right.
Q. -- the truck at D12?
A. Right. Right.
Q. All right. And so it's off in a muddy area? Is that your testimony?

Page 75

A. It's off in very, very muddy...
Q. But you see here --
A. It's right out.
Q. It's passable --
A. Yeah.
Q. So there are times when it is passable?
A. Right. And you can just see how muddy that picture was. Just imagine what that -- what that was like.
Q. And if you could go to the page -- the third from the end.
A. One, two -- okay.
MR. CARSEY: The next one.
THE WITNESS: The next one?
Q. (BY MR. TRAUBEN) There should be two panels. And on the right panel...
MR. CARSEY: That one.
A. Okay.
Q. (BY MR. TRAUBEN) You see the -- there's one with a man standing?
A. Yes.
Q. And I'll represent to you that's Terry Norman.
A. Okay.
Q. Probably can't recognize him from this picture.
A. No, I can't. He's a pretty nice guy. Have you talked to him?

Page 76

Q. Yes.
A. He's a nice fellow.
Q. Is this the --
A. And a good manager. He runs a good station there.
Q. Is this the large pit that you referred to?
A. Probably. That's one of them. There's several of them. But that looks like -- that looks like it.
Q. And it's in the left panel?
A. The left panel?
Q. The left panel is a photograph taken more from a distance?
A. Yes. Uh-huh. That looks like it. Right. But there are several -- there are several of them there.
Q. Do you know where that is located specifically on the --
A. I don't. But in a month from now, I'll know.
Q. But you referred to the large pit and you described it in your complaint. Is this the pit you complained about?
A. I believe the -- I believe one on the right is -- yes, I believe this is the big one.
Q. Is this the one that you took a photograph of in Exhibit 10?
A. I'm almost 100 percent positive that it is. But there are others. But this is the -- so they did have a chopper out there. Yeah. They didn't go through that -- the

Page 77

bog.
Q. Well, I don't want to become a -- a witness at your deposition --
A. Okay. Sure.
Q. -- but you're making some assumptions.
A. Okay. Well, it says they have a chopper. It says --
Q. Yes. They -- they did have both.
A. Oh, they did. Okay.
Q. But if you look at -- let me count them from the cover page. Go to the front cover and we'll count back together.
A. Okay.
Q. Okay. So if you flip one.
A. One.
Q. Two.
A. Two.
Q. Three.
A. Three.
Q. Four.
A. Okay. Three, four.
Q. Let's see. Now I lost count. One, two, three, four, six -- seven pages in.
A. Okay.
Q. It should be a large picture.

A. Yes.
Q. Okay. In the center of that picture, is that another one of the pits that you're complaining about?
A. I can't answer that question.
Q. Okay.
A. The only thing I can tell you is that in a few days I'm going to have -- I'm going to have them locate it and -- with a GPS location, all of them.
Q. Well, in -- I guess we'll get to that. Strike that.
MR. TRAUBEN: Why don't we go off the record for a minute.
(OFF THE RECORD.)
(Exhibits 13-14 marked.)
Q. (BY MR. TRAUBEN) Mr. Ingrum --
A. Yes, sir.
Q. -- you've been handed what the reporter marked as Exhibits 13 and 14.
A. Okay.
Q. Exhibit 13 are plaintiff's responses to defendant's first set of interrogatories --
A. Okay.
Q. -- and request for production. And Exhibit 14 is plaintiff's first supplemental responses to defendant's first set of interrogatories.
A. Okay.



MR. CARSEY: What was 12?
MR. TRAUBEN: 12 was the map that Mr. Ingrum marked.
Q. (BY MR. TRAUBEN) Looking at Exhibit 13, did you review these responses?
A. Yes, I did.
Q. And -- and you reviewed them. And look at the last page. You signed a verification to the responses?
A. Yes, I did.
Q. Okay. That's your -- your signature on the last page?
A. Yes, it is.
Q. In your response to interrogatory number two, we asked you to identify the individual who brought to your attention the -- the pit on your property.
A. Well, yes. Right.
Q. And you identified a migrant worker who worked part of the year on an -- on an adjoining ranch as a ranch hand?
A. Right.
Q. And then in the supplemental responses, you identified him as Lupe, in Exhibit 14?
A. Right. I saw that.
Q. You can take a look at --
A. Okay. I say that. I'm not sure that that's his name. They're -- you know, that's -- I'm not sure about that.



Q. Well, we'll -- when did you speak with Lupe about -- about the borrow pit?
A. This was late in 2004. I've got the date here. Let me double-check to be sure that that's...
Late in 2004. I was in there just visiting -- visiting around there like I do when I go through there.
Q. You say in there. Where is --
A. In Candelaria.
Q. In Candelaria.
And where did you meet Lupe?
A. He was walking on the street, standing -- you know, standing around talking to some friends, or something like that. And we got to talking. Are you asking me to tell you where I --
Q. Yes. Yes.
A. Okay. We got to talking. And he said that he worked on an adjoining ranch. There are several of them back there. I don't know which one there was -- which one there is. And I don't even know who the neighbors are over there. Because you never see anybody out there. And I talked to -- we got to talking. And he said that, well, he had -- that he went down and went through my ranch, my property, to fish in the -- in the Rio Grande because his -- because his property didn't run on the Rio Grande. And --
Q. When you say his property -- I'm sorry to interrupt,



but --
A. Not his property. Where he worked.
Q. Where he worked.
A. Where he worked.
Q. Go on.
A. And he said -- and we talked back and forth. And that's where he said, did you see the -- those -- that big gravel pit that they dug back in there. And I said, no, I haven't. And then early in May -- early in 2005, I walked back there and saw it and took the pictures that you have.
Q. Well, in 2004, after speaking with Lupe and learning about this, did you go and --
A. Well, it was late -- it was late in 2004. It was -- I don't remember when. It was like November or December, something like that.
Q. Had you already been to your property that day?
A. No. It -- I -- I guess I went up there to try to get in and -- and couldn't. I didn't. I couldn't get on the property. And I came back and was just talking to -- to this gentleman, this man. And that's when he told me about the gravel pit -- or the -- where they had taken the material, the road material. That was late in 2004. I'm not sure whether it was November or December.
Q. Did he tell you when the borrow pit, for lack of a better term, was constructed?





Electronically signed by Shana Wise (401-340-211-9479) 1b0420e4-5c40-48d7-b2d5-406f2d5221a3

A. No. He didn't -- he didn't talk about that.
Q. And did he -- did he say that he saw the thing being dug?
A. Well, he said that they had all the -- you know, he -- what did he -- did he say? He said, those guys that worked on the road - you know, something like -- you know, slang -- slang Mexican terminology - sure took a lot of material -- something along those lines. And of course, the only people that had been there for years have been the Corps of Engineer organization. The old -- Presidio County is probably -- might very well be the poorest county in the United States. And they had one old beat up -- I mean, and nobody around there has ever seen any equipment from Presidio County up in that neck of the woods. It's kind of an out-of-the-way place.
Q. Did you at that time ask him how you could get in touch with him again or anything like that?
A. No. No. We just -- you know, they -- if you talk to people and they give you a cell phone number or something to -- I can't -- for whatever reason you might want, then a month later, the cell phone is -- is gone. You know, it's -- it doesn't work anymore.
Q. Did you speak to any owners of neighboring property?
A. No. I have never spoken to an owner of neighborhood property in -- in -- since I've been out there. Never have.



Never seen -- you never see anybody on the roads. It's not like -- I've never seen anybody on the road. Driving from Candelaria to this property and back, I have never encountered a single individual, either driving or walking, on the road. You just don't -- it's very, very isolated and remote.
Q. Did you volunteer to Lupe that you owned property near Candelaria?
A. I'm sure I did. That's why -- I'm sure that's why he told me. If this -- you know, the street corner conversation. You know, he'll ask you, hey, what you doing out here. And I'd say, well, I'm just -- this place out here. And I'm out here just knocking around. You know, that type of conversation.
Q. Are there times that you would go to Candelaria and not go to your property?
A. Oh, yes. There's a lot of times I couldn't -- well, I take it back. Not many, but some. Because, you know, normally I could get a response out of the border patrol. No, we went up there last week and that road -- the bog is still -- is still full of water, you know. Normally I would get a response. But sometimes they couldn't -- you know, they couldn't find anybody. I never was quite sure whose jurisdiction it's in. Some people say it's in the Presidio jurisdiction. Some people say it's the Marfa jurisdiction. You know, so I would call all three of them, those two and the



substation south of Marfa.
Q. So you're saying that sometimes you would go to Candelaria hoping to get onto your property --
A. Hope to go get on -- right. Not many -- not very often. But I would try. But I -- I would try pretty hard. If you would talk to Terry Norman, he would tell you that I have called him a lot of times.
Q. Were there times -- did you have any other business in Candelaria other than to visit your property?
A. No. No. That would be the only reason.
Q. And do you have business within Presidio County in other areas other than --
A. No. No.
Q. Let me finish so that the record is clear.
A. Okay.
Q. -- other than for the purpose of your property?
A. No. No, I don't.
Q. Okay. So if you call Presidio, if you call Alpine, you call Marfa, on the phone logs, you're calling somebody to find out the conditions on your property?
A. Right. Right. I have no other reason to call them.
Q. In the Exhibit 14, the supplemental response to interrogatory number three --
A. Okay.
Q. -- that -- you say, I always travel to the property



by car.
You see where you -- in the last sentence of your supplemental response?
A. Yes.
Q. What type of vehicle are you referring to?
A. I would rent a -- a four-wheel drive vehicle from Enterprise, like a -- some type of four-wheel drive, pickup or -- not always Enterprise. But Enterprise or Hertz or --
Q. In a four -- four-wheel drive vehicle?
A. A four-wheel drive vehicle.
Q. So when you say car in response to interrogatory --
A. I mean a -- I mean a four-wheel drive, either SUV -- normally a pickup.
Q. Okay. Not a sedan vehicle?
A. No, no. No, no, no.
Q. You never tried to drive a Cadillac down --
A. No. No. Just look over the side of the road.
Q. In response to interrogatory number four, you said that -- in both the -- Exhibit 13 and 14, either one, you say that you were attempting to resell part of the property to have an interested buyer from when the property did close.
So are you -- when were you trying to resell the property and have an interested buyer from when the property did close?
A. Well, several months before -- before the property

closed.
Q. Before you actually closed --
A. Yes.
Q. -- you were trying to sell it --
A. I wanted to have an interested buyer -- I wanted to sell off part of it, not -- just a small part. And I had a -- you know, I wanted to have an interested buyer to sell part of it to when -- when the property closed. So I was -- I had a period of several months, maybe a year, that -- that I would -- I'd take people out there. Prior to closing.
Q. Do you have records of -- of who those interested buyers were?
A. No, I don't.
Q. You say, in response to interrogatory number five -- excuse me -- yes, number five. Actually, it's in the supplemental response. You said it was 35,000 square feet?
A. It's in the --
Q. Exhibit 14. In your supplemental response at the top of page four.
A. Okay. Is that this one?
Q. The supplemental. Right there.
MR. CARSEY: Yeah, that's supplemental.
A. Okay. 14. I'm -- let's see.
Q. (BY MR. TRAUBEN) Top of page four.
A. Okay.



MR. CARSEY: That's five. Back one. That's four.
A. Okay.
Q. (BY MR. TRAUBEN) Okay. You see there it says, at this point, I have calculated from the dimensions of the pit that approximately 35,000 square feet of soil was removed?
A. Yes.
Q. Okay. Did you measure the pit?
A. I measure -- I stepped it off.
Q. And we're talking about the large pit?
A. Yes.
Q. When did you do that?
A. When I went out there early in 2005 and discovered the pit. When I discovered it, I took these pictures and stepped it off.
Q. These pictures, referring to the pictures we talked about previously on page D13?
A. Well, but you -- you said that you didn't have -- well, yes. You -- right.
Q. The one that we saw earlier in your deposition that you took?
A. These pictures right here.
MR. CARSEY: No. Those are theirs.
Q. (BY MR. TRAUBEN) The one with the truck in the mud.
A. Right. That -- that picture.



Q. That picture and the other one of the pit --
A. Of the pit, right.
Q. -- that was a little dark.
A. Right. Those picture -- those two pictures there.
Q. On Exhibit 10.
So just based on walking it off?
A. Yes.
Q. Does the pit go down in the ground?
A. Yes, it does.
Q. Well, would you describe it more as a scraping from the sides?
A. I would say mainly -- it does go down in the ground some. But I would -- I would describe it mainly as a scraping from the side.
Q. What kind of material was taken?
A. They just call it road base.
Q. Who is they?
A. Any -- you know, anybody that -- anybody that builds roads, the county, the whatever, they would -- they would call that road base material. I mean, anybody that -- a road contractor, anybody like that, would call that road base material.
Q. Are you familiar with -- in your experience with real estate, are you familiar with different kinds of soils?
A. A little bit. Not much. Not much.



Q. Do you know what kind of soils there are on the ranch?
A. No, I don't.
Q. So do you know whether the material removed from the pit is suitable for road construction?
A. That, I don't know. But, I mean, I know that they took it for that reason. That's the only thing I know. I don't know whether it's suitable or not. But I know they took it for that -- for that reason.
Q. Are there -- are you aware of whether or not there are different grades of material for road construction?
A. No, I'm not. I'm sure there are, but I don't know anything -- I really don't know anything about that.
Q. Have you retained an expert to provide an opinion on the different kinds of materials?
A. We have a fellow that's going to be out there in about -- if we can get out there -- we're going to get out there one way or another sometime this month.
Q. So looking at your response to interrogatory number six -- you can stay with the supplemental response. It should be just below that.
You say, the nearest gravel pit is located in Presidio, about 50 miles down river. You see where I'm reading?
A. Yes.

Page 110

Q. And this is in the time period of March 26th, 2001. You're calling Presidio.
A. Right.
Q. Would that be the border patrol?
A. It could be. It could not. You know, I had -- I've got some friends in Presidio, too, that I call and ask them, what's going on or, you know, whatnot. And...
Q. Do you know the friend's number?
A. No, I don't. I haven't talked to him in a long...
Q. Well, if you're looking at the page -- let's stay with this document for a little bit. Page nine, lower right-hand corner. If you look at lines 73, 90, and 97.
A. 73, 90...
Q. And 97. These are --
A. There's 89 in there. Those two right there. 89 and 90.
Q. 89 -- 89 and 90. Yes.
A. I mean, I -- I had -- I've got a couple of good friends in both towns, both Marfa and Presidio.
Q. Well, if you're calling the same number repeatedly to Presidio, do you believe that's the border patrol you're calling?
A. It could be. It could be not. I've got a good friend there that --
Q. Would you call that friend several times a day?

Page 111

A. No, I wouldn't call him several times a day.
Q. Maybe every day?
A. No, I wouldn't call him every day.
Q. Do you want to take a moment and look through and do -- this document and tell me if you recognize any calls to Marfa, Alpine, or Presidio that you recognize as not being the border patrol?
A. No. I couldn't -- I couldn't --
Q. You couldn't do that?
A. I couldn't do that. I'm sorry.
MR. CARSEY: I identified the Marfa number is border patrol.
THE WITNESS: It is border patrol. Okay.
A. I get the feeling that Terry Norman retired. So he doesn't have to listen to me call him anymore. I called him a lot. Because he knew -- he always knew -- if you just talk to your average border patrol, you wouldn't know -- they wouldn't know who had been out there lately. But Terry would. Terry would know who -- who had been assigned, and he could call him on the radio and ask him.
Q. If you look at the last page of this Exhibit 16.
A. The last page. Okay.
Q. Correct.
You see that the --
A. 148?

Page 112

Q. Page 148.
The last telephone bill covered the period January 19, 2005 to February 18, 2005. Did you look for any records after that time?
A. Probably not.
Q. Do you have any recollection -- did you provide these phone records to counsel or did counsel obtain them by himself? Do you have any recollection?
A. I don't recall how this came about.
Q. Yeah. We talked about approaching your property from the north. You said there's a road from Valentine.
A. Somewhere around Valentine.
Q. Did you ever take that road?
A. I have not all the way. I've taken it partially. I've taken it from -- from wherever that turnoff is. And I don't -- frankly don't remember whether it's this side of Valentine or the other side. I've taken it down to the Rio Grande and went up the -- or went down river a little bit. But I've never taken it all the way to the -- to my property. But that's a long ways. That's a long, hard ride. I mean, you're talking about -- anyway, it's a long hard drive to -- to get that way.
Q. Did you try that route prior to acquiring the property or after?
A. I'm not sure. I don't remember.

Page 113

Q. Was the river road passable from that direction? Or why did you turn --
A. Yeah. I just -- it was such a long -- you know, the road is so rough. And you're traveling so slow. You know, you're traveling maybe ten miles an hour. And what happened to me, and you hear that it happens to a lot of people, is they go down there and they just get tired of -- my God -- my gosh, how much longer is this thing going to last. And they turn around and come back. And I'm sure that's the reason. And, you know, I saw the river. And that was kind of the main -- the main reason for going down there.
Q. Okay.
A. Frankly, I don't remember the reason for going down there.
Q. So just to the clear, you didn't turn around because the road was impassable --
A. No. The road -- the road was passable.
(Exhibit 17 marked.)
Q. Mr. Ingrum, you've been handed what the reporter marked as Exhibit 17 to your deposition.
A. Okay.
Q. Do you know what this is?
A. Yes.
Q. What is it?
A. It's a claim for damage.





Electronically signed by Shana Wise (401-340-211-9479) 1b0420e4-5c40-48d7-b2d5-406f2d5221a3

Page 126

recollection is that that road was shut down most of every year since the -- since the Corps of Engineers were down there. And I know for a fact that that road has not been open, let's say, from November 15 -- you know, it could be that you could take a four-wheeler down there right now.

Now, I asked -- when I was out there this last weekend, I talked to somebody. And they told me, no, that don't -- that you could not take a truck down that road. But that -- that road has been closed most of this year - I'd say like ten and a half or 11 months - to any type of -- any type of...

Q. And that's not based on your visits to the property --

A. No. That's --

Q. That's based on your conversations with --

A. With the border patrol.

Q. And any particular individual this year with whom you spoke?

A. Not really. The ones that -- like when Terry Newman retired -- and I haven't -- when -- when Humberto -- when he went -- was transferred to Arizona, I lost -- he wasn't transferred. He went over to TDY.

Q. So you didn't get the name -- you didn't --

A. This year, no.

Q. Not this year, you didn't get the name of -- with

Page 127

whom you spoke?

A. No. No.

Q. And then -- and individuals with the border patrol, if -- if somebody from the border patrol were to submit an affidavit stating that the road is passable most of the times of the year --

A. That's not going to happen.

Q. You don't --

A. That won't happen. That will not happen.

Q. You think that would be an inaccurate statement?

A. That -- that will not happen. No, sir. There's nobody going to do that. That would be an inaccuracy. And I don't believe there's any -- anybody over there that would do that.

Q. You would agree, though, that the border patrol works in that area?

A. Oh, yes. Oh, yes. Sure.

Q. And they're there every day in that area?

A. Well, not every day, but they're there on a regular basis.

Q. Regular basis?

A. Yeah. They had to quit using -- they had to quit doing surveillance by automobile. They had to do it by helicopter.

Q. Your land is visible by helicopter?

Page 128

A. Pardon me?

Q. Your land is visible --

A. Oh, yes. Sure.

THE WITNESS: There's a picture on your desk that shows that road full of water a month ago. I want to be sure and give the counselor a copy of that. And if we can't find it, then I have copies at home. And I'll mail you -- in fact, I'm -- do you have a government -- anyway, I'll mail you the -- a copy for you and a copy for him that shows -- that shows the entrance to the bog full of water a month ago. And I'll get you the date that those pictures were taken. And it will be about a month ago.

(Exhibit 19 marked.)

Q. (BY MR. TRAUBEN) Mr. Ingrum, do you recognize what the reporter has identified as Exhibit 19?

A. Yes, I do.

Q. And what is it?

A. It's an affidavit of Robert Ingrum.

Q. And is that your signature on the third page?

A. Yes, it is.

Q. And do you know why you've submitted an affidavit?

A. No, I don't. I just assume it was part of -- part of the lawsuit.

Q. In this case?

A. Yes.

Page 129

Q. Did you know that this was to be submitted to the court in federal claims?

A. I'm sure I did. You know, it states at the top that it is.

Q. So you understood that the court would rely on -- on this affidavit when actually ruling on the government's motion to dismiss?

A. I'm assuming that -- I understood that this was something that I needed to do for the lawsuit.

Q. In the lawsuit in response to the government's motion to dismiss?

A. Yes.

Q. Okay. If you look in the first page, paragraph two.

A. Okay.

Q. It says, in 1998, I purchased 3,300 acres of rural undeveloped land near Candelaria. You see where I am?

A. Yes.

Q. Is it more accurate to say that the land was purchased in 1999?

A. It is. It would be.

Q. Then later you say that it's approximately 600 miles, a 15-hour drive, in the same paragraph on the first page. Do you see --

A. Yes.

Q. -- in parenthesis?

with the seller?
A. That's right.
Q. All right. So this was performed a few months before the closing?
A. That's right.
Q. And did you submit a large version of Exhibit 8 to the Army in support of the claim that you submitted?
A. I would think that I did.
Q. And you wrote on -- at that time, you wrote on there the annotations that your counsel questioned you about?
A. Again, I don't -- I wrote on the one I submitted to him. Now, whether -- I frankly don't remember -- they had -- they had the big one like that. And there was some smaller ones that were just -- just exact duplicate of that -- of the big one. The small ones are exactly the same as the...
Q. Well, the reason why ask it, I was just -- it's not a major -- but this was in the government's files. So I'm assuming it was submitted to the Army in support of your claim. And that's how it ended up in the government's files in this -- prior to this lawsuit.
A. Right. Right.
Q. So you submitted it to the Army for --
A. Yes. I'm sure I did.
Q. And if you look at Exhibit 8 -- and the reason why I know it came from the government's files is it has a US number



on it.
A. All right.
Q. US704 in the lower right-hand corner.
A. Oh, yes. Uh-huh.
Q. And you mentioned to your -- in your response to your counsel's questions that there was some people that you were interested in selling the recreational rights to.
A. Lease -- to lease it.
Q. To lease it.
Can you identify any of those people?
A. No. Because I wasn't successful in doing that.
Q. Are there any documents about --
A. No.
Q. No letters, correspondence, nothing of that type?
A. No. No. I leased one -- I leased to one group. But that's been several years ago, and I don't remember their -- remember their name.
Q. You don't -- there's no documents?
A. No. No.
Q. Was the lease on paper?
A. No. He was a -- he was a wildlife photographer. Wanted some kind of a deal like that. It wasn't...
Q. There was no documentation?
A. No.
Q. And --



A. That's the only -- and -- and that -- you know, and it's seven or eight years. If this road had been -- not been messed up, I could have leased that every year, very easily, to -- for recreational purposes. But I wasn't able to do that because of the road.
Q. And now you're saying that you took prospective lessors to the property, but were not able to access it?
A. No. I didn't take them out there, because I called first and they'd tell me you can't -- the road is closed.
Q. And -- and so what happened with the lessors? You just never took them down or --
A. I just didn't take them down there, you know.
Q. And how many times did you have lessors or potential lessors interested in the property you did not take down?
A. Several. I mean, I couldn't tell you...
Q. Several. One time, two times?
A. Oh, more than that. Four or five. Four or five times.
Q. Four or five?
A. Four or five times.
Q. During what time period?
A. Oh, during the period of -- you know, after you -- after you try it for a while and then you can't get -- and you can't get access, then you kind of quit trying.
Q. Well, you have no names?



A. No, I don't.
Q. And there's no -- no correspondence?
A. I don't have any correspondence, no.
Q. And the photographer that you mentioned, the wildlife photographer, do you know what publication he worked for?
A. It was personal. It was a personal thing. He just liked to go out and take pictures and -- and that type of thing.
Q. And --
A. He was -- his wife liked the flowers and he liked...
Q. And how did he contact you?
A. Oh, I don't remember. It could be that -- I really don't remember how he contacted me.
Q. And the recreational -- the potential recreational lessors, do you know how they found you or you found them?
A. No, I don't. People -- a lot of times people will just look through the ownership records and say, well, here's a guy that owns some land over here, let's call him and see if he wants to lease -- you know, lease the recreational -- that's the way a lot of it happens.
Q. And did you contemplate taking the potential recreational lessors to the property from the north?
A. No. No. That's a very, very rugged, rugged, rugged, long -- I mean, it -- it might be...





Electronically signed by Shana Wise (401-340-211-9479) 1b0420e4-5c40-48d7-b2d5-406f2d5221a3