**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ROBERT INGRUM** | § | |
| | § | |
| *Plaintiff,* | § | **No. 07-121** |
| | § | |
| **v.** | § | |
| | § | **Hon. Mary Ellen Coster Williams** |
| | § | |
| **THE UNITED STATES OF AMERICA** | § | |
| | § | |
| *Defendant.* | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S RENEWED MOTION TO DISMISS AND MEMORANDUM IN SUPPORT THEREOF**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Robert Ingrum ("Plaintiff"), through his undersigned counsel, responding to The United States of America's ("Defendant") Renewed Motion to Dismiss, and in support would show as follows:

## I.
## SUMMARY

1.1 Defendant has again moved, pursuant to Rules 12(b)(1) and 12(h)(3) of the Rules of the United States Court of Federal Claims ("RCFC"), to dismiss Plaintiff's action for lack of jurisdiction, alleging that Plaintiff untimely filed this action under 28 U.S.C. § 2501. The sole basis of Defendant's motion is that Plaintiff did not file this action within the six (6) year limitations period set forth in 28 U.S.C. § 2501. Plaintiff's response, as set forth in greater detail below, is that the Defendant's acts of taking Plaintiff's property for use in its road construction operation were "inherently unknowable" at the time it occurred.

## II.
## FACTUAL BACKGROUND

2.1 In 1999, Plaintiff purchased 3,300 acres of rural, undeveloped land near Candelaria, Texas. Plaintiff had the property under contract for three or four years preceding closing, during which time he had access to the property. Due to the rural nature of the property and the length of the drive from his home in Austin, Texas (approximately 550 miles; a 10 hour drive), Plaintiff visited the property approximately once a year. Because the property is and was unimproved, there existed no pressing need for Plaintiff to access the property, nor to take extraordinary measures to access the property.

2.2 The most accessible entry into and across the subject property is an unpaved section of Highway 170 that is known as the "River Road." The River Road is used by the United States Border Patrol to interdict narcotics and smugglers. From March through April of 1999, the U.S. military's Joint Task Force-6 (JTF-6) undertook and completed a mission to repair several miles of the road.

2.3 The River Road crosses the land of several private landowners, including Plaintiff's ranch. Before beginning work on the road, the JTF-6 obtained written "Rights of Entry" to allow them to enter onto the owner's land to repair the road. The Rights of Entry form contained language by which a landowner could opt to allow the use of materials from his property or prohibit the use of said materials. Plaintiff executed said agreement on March 13, 1999 and did not circle or otherwise highlight either option on the form, the effect of which was to prohibit the taking of material from the property. In a memorandum written to the Chief of Staff on August 31, 2004, U.S Army Colonel Paul R. Disney confirmed that "*(Mr. Ingrum) did*

*not grant the Government the right to use any materials from his land.*" See Ex.. 1 (Col. Paul R. Disney Memorandum 8-31-04).

2.4 When Plaintiff attempted to access his property after completion of the road work by the JTF-3, Plaintiff discovered that he was unable to enter his property from the usual entry from the south because the road had been reworked in such a fashion that it had no drainage and the road and the surrounding area had been rendered a virtual lake. For Plaintiff to access the property from the north would have required an additional 7-9 hours of driving and, due to the extremely rugged terrain to the north, a specialized off-road vehicle which was an untenable option. See Ex. 2 (Declaration of Robert Ingrum). During the ensuing five years, Plaintiff (1) attempted to enter his property personally on five or six occasions, only to find that the entrance was impassable, and (2) stayed in frequent contact with the Border Patrol by telephone on numerous occasions to determine if he was able to access his property if he made the arduous drive from Austin, only to be told that the entrance to the property was impassable. Although on some occasions it was reported to Mr. Ingrum that the road was passable, these were at times when it was not convenient for Mr. Ingrum to make the arduous drive. While Plaintiff was aware that the Defendant had poorly constructed the road that he had given access to his property for Defendant to rebuild, he was in no way put on notice that Defendant had violated the "Rights of Entry" agreement by using his property in the construction of the road without his permission.

2.5 In May of 2004, Plaintiff was informed by a migrant worker who he believed to have been working for a neighboring property owner (who had trespassed upon the property from adjoining land to access the Rio Grande River) that, for use in the reconstruction of the River Road on Plaintiff's property, the Defendant had excavated a substantial amount of landfill from Plaintiff's property for use as road base. Removal of the materials left a pit on Plaintiff's

property with an approximate area of 35,000 sq. ft. and a height of approximately twenty feet. This material was removed without the Plaintiff's knowledge or consent. Because the Defendant's "mal-construction" of the road had thus far prohibited Plaintiff from accessing his property from the customary entrance, and because the excavation pit was not visible from the only normal entrance to the property, the damage was undiscoverable to Plaintiff until he was thusly informed.

2.6 Upon discovering that the Defendant had taken his property for use in the road construction without his permission, Plaintiff immediately took steps to receive compensation for his damages. After exhausting his administrative remedies, he filed suit on August 2, 2006.

2.7 Plaintiff's declaration setting forth these facts is attached hereto as Exhibit 2, and incorporated herein by reference the same as if fully set forth at length.

## III.
## ARGUMENT

3.1 Plaintiff's discovery of the Defendant's actions in taking his property without his authority occurred during the spring of 2004 when a migrant worker discovered the excavation pit while trespassing upon Plaintiff's property on foot from adjacent property. Prior to that time, Plaintiff had no reason to believe that the Defendant had violated the Rights of Entry agreement which Colonel Paul R. Disney himself admits gave the Government no right to remove property from Plaintiff's land. Plaintiff was unable to access his property via normal means because of Defendant's malfeasance in constructing the road improperly, and was completely unaware of the existence of the excavation area that revealed the Defendant's breach of the Rights of Entry agreement.

3.2 The Defendant claims in its motion that "(i)f Mr. Ingrum had undertaken any inquiry or investigation, he would have learned of the alleged use of the material from his

property for the road." That is like Kenneth Lay telling Enron's employees, "Although I stole your retirement monies without your knowledge and covered my tracks meticulously, if you had just investigated me you would have been able to discover my misdeeds." Mr. Ingrum had no reason to inquire or investigate whether the Government had violated the terms of the Rights of Entry until he was informed that there may have been a breach. Only if one found a way to access the property could one then discover that the pit was in "plain view", because ***it was not in plain view from the entrance to the property***. Plaintiff had no cause to take extraordinary measures to access his property because he was not required to assume that the Defendant had breached the Rights of Entry agreement. It would be illogical to conclude that the fact that Plaintiff knew that Defendant was reconstructing the road on his property created constructive knowledge that Defendant also was violating its agreement.

## IV.
## LAFONT V. UNITED STATES IS DISTINGUISHABLE

4.1 Defendant again relies primarily upon the case of LaFont v. United States, 17 Cl. Ct. 837 (1989) for the proposition that limitations should have begun to run in this case when the road construction started on Plaintiff's property in 1999. LaFont involved a very distinguishable situation where the Corp of Engineers conducted dredging operations in a waterway where LaFont's oyster lease was located. The conclusion there is simple: Dredging involves the removal of the bed of the waterway. Oyster beds are located on the bed of the waterway. Therefore, it would put one on notice that if dredging was occurring over one's oyster beds, the beds would very likely be dredged away. In the present case, however, the same logic does not hold. Reconstruction of a gravel road involves grading and reshaping. The Government entered into an agreement that it would not use the property owner's soil for the construction without his permission. The Government completely mis-constructed the road to have a concave face, thus

collecting and pooling water instead of shedding water, thus prohibiting the property owner from accessing the property to discover the breach of its agreement. Where is the property owner put on notice that the Government has also violated its Rights of Entry agreement and converted 35,000 yards of the property owner's soil to construct this White Elephant?

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Robert P. Ingrum, prays that after due proceedings are had, Defendant's Renewed Motion to Dismiss be denied and that Plaintiff have his day in court.

Dated this 25th day of February, 2008.

Respectfully submitted,

MINTON, BURTON, FOSTER & COLLINS
A Professional Corporation
1100 Guadalupe Street
Austin, Texas 78701
512/476-4873 (telephone)
512/479-8315 (telecopier)

/s/ John C. Carsey
JOHN C. CARSEY
State Bar No. 03898800

***Attorneys for Plaintiff***

# EXHIBIT 1

J3

31 Aug 04

MEMORANDUM FOR Chief of Staff

SUBJECT: Congressional inquiry of the Honorable Lamar Smith regarding matter of Robert P. Ingrum

1. I have directed investigation of the matters raised by the letter of the Honorable Lamar Smith on behalf of Mr. Robert P. Ingrum. Mr. Ingrum alleges that "a couple of years ago" the Corps of Engineers improperly used material from his land to repair a road in Candelaria, Texas thereby causing extensive damage to his private property. JTF-6 was not operating in Candelaria during that time, however, I am dispatching an environmental engineer to assess whether a 1999 JTF-6 mission could have caused the damage. I expect to have a report from him within 21 days at which time I will provide you an updated assessment.

Discussion.

2. On May 28, 2004, Mr. Ingrum wrote to the Honorable Pete P. Gallego, a Texas State Representative (Enclosure 1). Mr. Ingrum states that "a couple of years ago", the U.S. Corps of Engineers set up a base of operations in Candelaria, Texas to rebuild Highway 170, a road running through his property. During a trip to his ranch "at a later date", he discovered that "quite a few miles worth" of material had been taken from his property without his permission. He estimates the value of the material taken form his property at $46,200 per mile for which he has not received compensation.

3. On July 30 2004, Representative Gallego forwarded Mr. Ingrum's letter to Congressman Lamar Smith (Enclosure 2). On August 13, 2004, Congressman Smith forwarded Mr. Ingrum's letter to Colonel Gorden M. Wells, Commander of the US Army Corps of Engineers Forth Worth District (Enclosure 3). On August 19, 2004, the Corps of Engineers forwarded Mr. Ingrum's letter to JTF-6 and we initiated a review of our records relating to the matter (Enclosure 4).

4. In his letter, Mr. Ingrum refers to work done "a couple of years ago". JTF-6 has not conducted engineering work in Candelaria, Texas since 1999. However, in February

J3

SUBJECT: Congressional inquiry of the Honorable Lamar Smith regarding matter of Robert P. Ingrum

through April 1999, JTF-6 conducted mission JT 487-99. During JT 487-99, military engineers repaired several miles of "River Road" used by the U.S. Border Patrol to interdict narcotics smugglers. "River Road" is an unpaved road that connects to Highway 170.

5. The "River Road" crosses the land of several private landowners. Before beginning work, the Government obtained written "Rights of Entry" to allow the Government to enter onto the owner's land to repair the road. Unless specifically granted by the landowner, however, a Right of Entry does not grant the Government the right to use materials from the land. On March 13, 1999, Mr. Ingrum executed a Right of Entry granting the Government the right to enter his land to repair portions of River Road located on his property. However, he did not grant the Government the right to use any materials from his land.

6. At this time, we are unable to determine whether engineers from the 1999 JTF-6 mission improperly took material from Mr. Ingrum's land. Visual inspection may assist in determining whether the JTF-6 mission improperly used material from Mr. Ingrum's land or whether the damage may have been caused by other entities or factors. I have directed a JTF-6 environmental engineer familiar with the 1999 mission to travel to the area to conduct an assessment. While the area has recently flooded, I anticipate a report on his observations within the next 21 days. I will provide you an updated assessment at that time.

7. Regarding Mr. Ingrum's desire for compensation, he may immediately file a Standard Form 95, Claim for Damage, Injury, or Death to seek compensation (Enclosure 5). He is not required to wait for the conclusion of our investigation. The claims procedure is governed by the Federal Torts Claims Act, 28 USC sections 2671-2680. He may receive additional information and submit his claim to his nearest military installation or the claims office at Fort Bliss:

Staff Judge Advocate Office
US Army Air Defense Artillery Center
ATTN: Tort Claims
Building 113, Pershing Road
Fort Bliss, TX 79916 Telephone:
915) 568-5650

J3
SUBJECT: Congressional inquiry of the Honorable Lamar Smith regarding matter of Robert P. Ingrum

9. In the interim, I am available at (915)568-9090 to answer any concerns regarding this matter.

PAUL R. DISNEY
COL, USA
J3

# EXHIBIT 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **ROBERT INGRUM** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| | § | |
| | § | |
| | § | **No. 07-12L** |
| **v.** | § | |
| | § | **Hon. Mary Ellen Coster Williams** |
| **THE UNITED STATES OF AMERICA** | § | |
| | § | |
| ***Defendant.*** | § | |

DECLARATION OF ROBERT INGRUM

State of Texas §
§
County of Travis §

BEFORE ME, the undersigned authority, on this day appeared Robert Ingrum, who is personally known to me, and first being duly sworn, according to law, stated as follows:

1) "My name is Robert Ingrum. I am over twenty-one (21) years of age, of sound mind and fully capable of executing this affidavit. I have personal knowledge of the facts contained herein and am fully competent to execute this affidavit. The facts stated in this affidavit are all true and correct.

2) In 1999, I purchased approximately 3,300 acres of rural, undeveloped land near Candelaria, Texas. I had the property under contract for three or four years preceding closing, during which time I had access to the property. Due to the rural nature of the property and the length of the drive from my home in Austin, Texas (approximately 550 miles; a 10 hour drive), I am only able to visit the property approximately once a year. Because it is undeveloped property, there is no urgency or necessity to inspect the property on a more frequent basis.

3) The normal and most convenient access into and across the subject property is

from the south on an unpaved section of Highway 170 that is known as the "River Road." The River Road is used by the United States Border Patrol to interdict narcotics and smugglers. From March through April of 1999, the Joint Task Force-6 (JTF-6) completed a mission to repair several miles of the road.

4) The River Road crosses the land of several private landowners, including my ranch. Before beginning work on the road, the Government obtained written "Rights of Entry" to allow the Government to enter onto the owner's land to repair the road. The Rights of Entry form contained language by which I could either opt to allow the use of materials from my property or prohibit the use of said materials. I executed said agreement on March 13, 1999 and did not circle or otherwise highlight either option on the form, the effect of which was to prohibit the taking of material from my property without my permission. In a memorandum written to the Chief of Staff on August 31, 2004, U.S Army Colonel Paul R. Disney confirmed that "*(Mr. Ingrum) did not grant the Government the right to use any materials from his land.*"

5) When I attempted to access my property from the usual entrance after completion of the road work by the JTF-6, I discovered that I was unable to enter my property because the road had been reworked in such a fashion that it had no drainage and the road and the surrounding area had been rendered a virtual lake. For me to access the property from the north would have required an additional 7-9 hours of driving, which was an untenable option. During the ensuing five years, I (1) attempted to enter my property personally on five or six occasions, only to find that the entrance was impassable, and (2) stayed in frequent contact with the Border Patrol by telephone on numerous occasions to determine if I was able to access my property if I made the arduous drive from Austin, only to be told that the entrance to the property was impassable. Although on some occasions it was reported to Mr. Ingrum that the road was passable, these were at times when it was not convenient for me to make the arduous drive. While I was aware that the Defendant had poorly constructed the road that I had given access to

my property for Defendant to rebuild, I was in no way put on notice that Defendant had violated the Rights of Entry agreement by using my property in the construction of the road without my permission.

6) In May of 2004, I was informed by a migrant worker who I believed to have been working for a neighboring property owner (who had trespassed upon the property on foot from adjoining land to access the Rio Grande River) that, for use in the reconstruction of the River Road on my property, the Defendant had excavated a substantial amount of landfill from my property for use as road base. Removal of the materials left a pit on my property with an approximate area of 35,000 sq. ft. and a height of approximately twenty feet. This material was removed without my knowledge or consent. Because the Defendant's "mal-construction" of the road had thus far prohibited me from accessing my property, and because the excavation pit was not visible from the only normal entrance to the property, the damage was undiscoverable to me until I was thusly informed.

7. Upon discovering that the Defendant had taken my property for use in the road construction without my permission, I immediately took steps to receive compensation for my damages. After exhausting his administrative remedies, I filed suit on August 2, 2006."

Further Affiant sayeth not.

Robert Ingrum, Affiant

SUBSCRIBED AND SWORN TO before me the undersigned authority, on this 25th day of February, 2008, to certify which witness my hand and official seal.

PAMELA D. BERRY
Notary Public State of Texas
My Commission Expires
MAY 20, 2009

Notary Public in and
for the State of Texas