# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ROBERT INGRUM )
Plaintiff, )
)
)
vs. ) No. 07-12L
) Hon. Mary Ellen Coster Williams
)
THE UNITED STATES OF AMERICA)
Defendant. )

---

ORAL DEPOSITION OF
ROBERT INGRUM
DECEMBER 10, 2007

---

ORAL DEPOSITION OF ROBERT INGRUM, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on DECEMBER 10, 2007, from 9:50 a.m. to 2:37 p.m., before Shana R. Wise, CSR in and for the State of Texas, reported by method of machine shorthand, at the Law Offices of Minton, Burton, Foster & Collins, 1100 Guadalupe Street, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



Electronically signed by Shana Wise (401-340-211-9479) 1b0420e4-5c40-48d7-b2d5-406f2d5221a3

APPEARANCES

FOR THE PLAINTIFF:
Mr. John C. Carsey
MINTON, BURTON, FOSTER & COLLINS
1100 Guadalupe
Austin, Texas 78701
(512) 476-4873
jcarsey@mbfc.com

FOR THE DEFENDANT:
Mr. Bruce K. Trauben
DEPARTMENT OF JUSTICE
601 D Street, NW
Washington, DC 20004
(202) 305-0238
bruce.trauben@usdoj.gov
-AND-
Captain Lisa Satterfield
THE UNITED STATES ARMY



INDEX


| | PAGE |
|---|---|
| APPEARANCES | 2 |
| STIPULATIONS (Attached hereto) | |
| ROBERT INGRUM | |
| EXAMINATION BY MR. TRAUBEN | 5 |
| EXAMINATION BY MR. CARSEY | 133 |
| FURTHER EXAMINATION BY MR. TRAUBEN | 137 |
| CHANGES AND SIGNATURE | 143 |
| REPORTER'S CERTIFICATE | 145 |


EXHIBITS


| NO. | DESCRIPTION | PAGE IDENT. |
|---|---|---|
| 1 | Map | 17 |
| 2 | January 8, 1998 Letter to Mr. Alan Wittenberg from Dan L. Wilkinson, Ph.D. | 33 |
| 3 | Affidavit Regarding Compliance with Contract Obligations and Acceptance of Property | 34 |
| 4 | Earnest Money Contract | 36 |
| 5 | Earnest Money Contract | 38 |
| 6 | Amendment of Contract of Sale | 44 |
| 7 | General Warranty Deed (all cash) | 45 |
| 8 | Survey | 47 |
| 9 | Military Construction, Training and Operations Right-of-Entry Permit | 49 |
| 10 | Photographs | 63 |
| 11 | River Road Site Visit December 4, 2007 | 68 |




EXHIBITS - continued


| NO. | DESCRIPTION | PAGE IDENT. |
|---|---|---|
| 13 | Plaintiff's Responses to Defendant's First Set of Interrogatories and Requests For Production of Documents | 78 |
| 14 | Plaintiff's First Supplemental Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents | 78 |
| 15 | MapQuest Printout | 98 |
| 16 | Phone Records | 102 |
| 17 | Claim for Damage, Injury, or Death | 113 |
| 18 | Letter to The Honorable Pete Gallego | 114 |
| 19 | Affidavit of Robert Ingrum | 128 |


*-*-*-*-*



ROBERT INGRUM,
having been first duly sworn, testified as follows:
EXAMINATION
QUESTIONS BY MR. TRAUBEN:
Q. Could you please state your full name for the record.
A. It's Robert P., Porter, Ingrum, I-n-g-r-u-m.
Q. For the record, my name is Bruce Trauben. I represent The United States in the action of Robert Ingrum versus the United States. And we're here to take your deposition, as you know. I'll go over just a few ground rules. The idea for the proceedings today is that I'll ask you questions. And hopefully you can provide answers to the best of your recollection. If you don't recall something, just say so. That's fine.
A. Okay.
Q. When I ask you a question and you give a response, we'll assume that you understood the question.
A. Okay.
Q. And if you don't understand the question, please ask -- you know, just let me know and I'll try and rephrase it.
A. Okay.
Q. We have a court reporter here who is taking down every word that is being said today, which means that we have to respond in words verbally. Nods of the head, things like





Electronically signed by Shana Wise (401-340-211-9479) 1b0420e4-5c40-48d7-b2d5-406f2d5221a3

Page 46

Q. -- the guarantor?
A. No. No. The recipient would not sign it, no.
Q. The guarantor would sign the deed --
A. The guarantor would sign.
Q. And is this signed by the guarantor?
A. Yes, it is.
Q. And this is the deed conveying the Candelaria property to you and to your wife?
A. Yes. It appears to be that.
Q. And did you retain a copy of this in your records?
A. I did not.
Q. This is Bates numbered D, as in David, 21 through 26. Do you know whether you made a copy of this available to your attorney?
A. This -- of this deed?
Q. Yes.
A. No, I did not. I wasn't able to find any papers relating to...
Q. Did you have the deed recorded?
A. Oh, yes. It was recorded.
Q. Did you do that or did --
A. No.
Q. -- the seller?
A. The title company did.
Q. The title company. Rattikin?

Page 47

A. Rattikin. I assume that they did. You know, I want to check on it, but I -- I assume that they did.
Q. During that -- the time period after you entered into the earnest money contract and -- and then closing, did you continue to visit the property, as we had discussed previously?
A. Yes. Uh-huh.
Q. And during that time period, were you able to traverse the river road?
A. Yes, I was. I was able to traverse the river road until the Corps of Engineers showed up out there, whenever that period was.
Q. The date at the top of the deed, March 16, 1999, does that refresh your recollection as to the date of the closing?
A. It does not. But I -- I have no reason to believe that that's not correct.
(Exhibit 8 marked.)
Q. For the record, you've been handed what's been marked as Exhibit 8.
MR. TRAUBEN: And I'm -- I only have two copies.
MR. CARSEY: Okay. That's fine.
MR. TRAUBEN: This actually -- if you want to see the oversized -- I didn't want to --

Page 48

MR. CARSEY: I've -- I've seen that. That's fine.
MR. TRAUBEN: -- have the oversized document entered into the record because it was -- cost more to have it copied.
Q. (BY MR. TRAUBEN) Do you recognize what this is?
A. I certainly do.
Q. And is that your handwriting upside down at the bottom?
A. It actually looks like my handwriting.
Q. And then in the survey number 16, survey section 16, there's a note, a handwritten note. Is that your handwriting?
A. Oh...
Q. There's a square and a note underneath, gravel pit created by Corps of Engineers. You see where I'm --
A. Yes, I see that.
Q. Is that your writing?
A. I'm -- I'm quite sure it is.
Q. And did I read that correctly? It's a little faint. I just want to make sure we see the same thing.
A. Yes. Gravel pit created by Corps of Engineers.
Q. And then also towards the bottom of the survey section number 14, there's a word in quotes, bog --
A. Bog.
Q. -- double underlined.

Page 49

A. That looks like -- I'm sure that's mine. That -- that looks like my writing.
Q. Okay. And is this the survey that was prepared in advance of closing?
A. Yes, it is.
Q. Where you wrote in bog, that area down below --
A. Yes.
Q. -- does the river run close to the road at that point?
A. It would be -- let me -- actually, I'm going to have to look at it and see. It shows that it does. It looks -- let me think here. It seems like the river would be about 30 or 40 feet, just a guess, from there.
Q. Any creeks run through that area?
A. I don't think -- no. I don't think so.
Q. And I have the full-sized version of Exhibit 8 if you need to see it.
A. Okay. No. That's okay.
Q. I didn't want to put it into the record.
A. Okay.
(Exhibit 9 marked.)
Q. And, Mr. Ingrum, you've been handed what has been marked as Exhibit 9 to your deposition. And for the record, it has Bates numbers US00565 through 00570. And earlier in your deposition you referred to a right-of-entry. Is this a



Electronically signed by Shana Wise (401-340-211-9479) 1b0420e4-5c40-48d7-b2d5-406f2d5221a3

Page 94

Q. And in your experience in real estate, normally you would have to have property rezoned before you could have a pit -- a gravel pit operation?
A. I would imagine I -- today I -- you know, no telling today. People -- I would imagine there's something -- I don't -- I don't -- I don't know the answer to that question.
Q. Okay. That's fine.
A. Okay.
Q. Now, how long is the stretch of road that crosses your property?
A. Not quite three miles. It -- on -- on -- it's about two and three-quarter miles probably as it -- like that, it's probably about three.
Q. Like that, you mean winding?
A. Winding. I would say it's two and three-quarter miles. Two, three miles.
Q. Did you suffer any out-of-pocket losses as a result of the taking of any property -- any soil?
A. I don't know what that means. What does that mean?
Q. Well, what I mean is -- we can ask it in different ways.
Did the value of your property go down as a result of the removal of any material from your property?
A. Absolutely.
Q. And how do you know that?

Page 95

A. Well, I just know by -- you know, the -- the property out there has -- you have about -- it's the -- the whole -- the whole reason for it to have value is why -- when you look at this pretty -- this stuff, these pictures, you say, oh, that's pretty. It's the visual. This is a -- it's a visual thing. The people have a -- they buy this kind of stuff because of its visual impact, because it's just nice to look at.
Q. That's why you bought it?
A. That's why I bought it. Exactly.
And they -- this stuff, they don't -- the people that are buying this kind of stuff, they don't want a gravel pit on their property. I can assure you of that. You know, they want a -- they want to get away from -- you know, they want to get completely away from -- from any type of stuff like that.
Q. Let me ask. Has any potential buyer rejected the property because there was material scraped off the sides of --
A. I was -- it was never offered to anybody other than that -- that one buyer. And I frankly was never, that I can remember -- I don't remember -- you know, there could have been -- over a period of time, there could have been several people that I showed property to. I mean, there were several people that I showed property to. I had -- I had one that I thought was a real interested buyer. But to answer your

Page 96

question -- I'm sorry. I forgot. What -- what...
Q. The question was whether anybody rejected purchasing your property because the material had been scraped off the sides of it.
A. Well, they never went -- they -- of course, they never saw it after -- you know, once they had scraped it off, the bog was already there. I mean, you know, they had already created the bog by digging a lake there. And...
Q. So you never took a potential buyer past this part of the property?
A. No. No. I couldn't -- you couldn't get them back in there.
Q. Did you ever take any potential buyers over your property by airplane?
A. You know, I think I might -- I did one time.
Q. When was that?
A. But that also was before -- I'm sorry. I can't answer when it was. It was sometime during the -- you know, it was during the negotiation period through -- I'm sorry. I don't remember.
Q. Before you closed on the property?
A. I can't answer that. It was sometime -- I just can't -- and I wouldn't have a way of verifying that either.
Q. Do you recall where you took a plane from?
A. From Marfa.

Page 97

Q. So you drove to Marfa, took a plane from there with a potential buyer, and reviewed the property?
A. Right. Right. And that was -- I don't remember when it was. It wasn't a very good buyer. He wanted -- he wanted to show his girlfriend that he was going to buy some land. But that was the main thing.
Q. In response to interrogatory number 11 -- you can look at the -- let's stay with the supplement.
The route that you take to get to your property?
A. Highway 35 for 80 miles to San Antonio. Highway 95 -- I'm sorry. Highway 90 from San Antonio to Marfa. Highway 65 from Marfa to Presidio.
Q. Is that 67?
A. 67. I'm sorry. Highway 67 to Presidio. County Road 170, or river road.
Q. Well, let me ask you --
A. I missed -- I left something out here.
Q. Yes?
A. County Road 170 -- County Road 170 from Presidio to -- to Ruidosa. This actually -- County Road 170 from Presidio to Candelaria is 48 miles. Okay? And then it's -- it's all paved to Candelaria. And then from Candelaria to the property, it's about four miles.
Q. Why don't you take Highway 10?





Electronically signed by Shana Wise (401-340-211-9479) 1b0420e4-5c40-48d7-b2d5-406f2d5221a3