# In the United States Court of Federal Claims

**No. 07-12L**
**(Filed: April 28, 2008)**

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

**ROBERT INGRUM,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

**Fifth Amendment Taking; Statute of Limitations; 28 U.S.C. § 2501; Accrual of Cause of Action; Duty to Inquire.**

John C. Carsey, Minton, Burton, Foster & Collins, P.C., 1100 Guadalupe Street, Austin, Texas 78701, for Plaintiff.

Bruce K. Trauben, U.S. Department of Justice, P.O. Box 663, Washington, D.C. 20044-0663, for Defendant.

---

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S RENEWED MOTION TO DISMISS

---

**WILLIAMS, Judge**

Plaintiff, Robert Ingrum, brings this takings suit under the Fifth Amendment to the Constitution seeking $324,000 in compensation for the Government's removal of fill material from his property. This matter comes before the Court on Defendant's motion to dismiss the action as time-barred under the six-year statute of limitations in 28 U.S.C. § 2501.

The alleged taking resulted in a 20-foot high, 35,000 square-foot pit on Plaintiff's undeveloped 3,300 acre property in rural Texas. The parties agree for purposes of this motion that the fill was removed in April 1999. Plaintiff claims that his cause of action did not accrue until he was informed of the taking in 2004, because the pit was "inherently unknowable," as he lived some 550 miles away from the property, and frequent flooding either prevented him from accessing the property or rendered his journey prohibitively lengthy, arduous and inconvenient. Because

Defendant's alleged taking of fill material from Plaintiff's property was open and notorious and discoverable by Plaintiff through the exercise of reasonable diligence, Plaintiff should have known of the taking when it occurred. As such, Plaintiff's claim accrued in April 1999, and this action, filed more than six years later, is time-barred.

## **Background**[1]

Plaintiff is the owner of approximately 3,300 acres of rural, undeveloped land near Candelaria, Texas which he purchased for $98,000 on March 16, 1999. Running across this property and that of several adjacent landowners is an unpaved portion of Highway 170 known as the "River Road." The River Road is patrolled frequently by the United States Border Patrol (USBP) to interdict illegal immigrants and drug smugglers entering the United States from Mexico. Approximately 2 3/4 miles of the River Road crosses the property, and this portion of the road provides the only vehicle access to the property. The property can be accessed from both the north and the south via the River Road.

In 1997, a portion of the River Road south of the property was washed out by heavy rains and was no longer passable. Consequently, the USBP sought and received the assistance of a Department of Defense Joint Task Force 6 (JTF-6), to construct a bypass around the eroded portion of the River Road.[2] To construct the bypass and to make additional improvements to the road, JTF-6 used an unknown quantum of fill material from the property. The fill was excavated by JTF-6 from the side of a hill at the "gravel pit" on the property. JTF-6 completed construction of the bypass and road improvements in 1998 prior to Plaintiff's purchase of the Candelaria property.

During the summer of 1998, heavy rains again eroded portions of the River Road, and JTF-6 returned in early 1999 to perform additional repairs. On March, 13, 1999, just days before closing on the property, Plaintiff signed a "Military Construction, Training and Operations Right-of-Entry Permit" (Right of Entry) authorizing JTF-6 to enter the property and make improvements to the River Road. The Right of Entry stated:

> The undersigned, hereinafter called the "Owner" hereby grants to the UNITED STATES OF AMERICA, hereinafter called the "Government", a right-of-entry permit upon the following terms and conditions:
>
> 1. The Owner hereby grants to the Government the right to enter

---

[1] This background is derived from the Complaint, the affidavit of Robert Ingrum dated April 20, 2007, the December 10, 2007 deposition of Robert Ingrum, and exhibits to the parties' motion papers.

[2] JTF-6 is a Department of Defense Task Force comprised of personnel from the Army and the Marine Corps. Def.'s Renewed Mot. to Dismiss at 5 n. 7.

> upon the lands hereinafter described ("the land") at any time within the following period: February 1, 1999 through December 31, 1999, in order to carry out military training and operations on said lands by the Government.
>
> a. The purpose of the work is for military training and operations.
>
> b. Construction in connection with the use of this site will include: Re-construct and improvement of Presidio County River Road from Candelaria, Texas to Chispa Road Intersection. Restoration of the areas involved in the construction is not required and is waived by the Owner.
>
> c. The use of military equipment, including tracked and wheeled vehicles, aircraft, aircraft flights, and/or landings in and over this land may be involved as a part of this military training operation.
>
> . . . .
>
> 4. The Government agrees to be responsible for damages arising from the activity of the Government, its officers, employees, or representatives on said land . . .

Def.'s Renewed Mot. to Dismiss Ex. 9F at 1-2. The Right of Entry also contained a provision stating "The Owner (does/does not) grant the Government the right to use any buildings, timber or any other products of the land," but Plaintiff did not mark either the "does" or "does not" option on the form. Id. at 2. According to a memorandum dated August 31, 2004, Colonel Paul R. Disney of the United States Army interpreted this to mean that Plaintiff "did not grant the government the right to use any materials from his land." Pl.'s Resp. Ex. 1 at 2.

From March to April 1999, JTF-6 repaired portions of the River Road -- regrading the road, installing cement culverts over dry creek beds and constructing cement road segments in low-lying areas. To execute these repairs, JTF-6 again used an unknown quantum of fill material excavated from a hillside at the gravel pit on Plaintiff's property. The repairs were completed in April, 1999.

The removal of fill material from the gravel pit left a bowl-like formation on the property approximately 35,000 square feet in area and 20 feet in height. The gravel pit was located at the approximate halfway point of the 2 3/4 mile stretch of the River Road traversing the property and was visible from the portion of the River Road on the property. Tr. (Apr. 2, 2008) at 26-27; Def.'s Renewed Mot. to Dismiss Ex. 9H at US00992.

During the five years after JTF-6 completed the 1999 repairs to the River Road, Plaintiff made the ten-hour drive from Austin, Texas, on five or six occasions and attempted to enter the property via the southern portion of the River Road only to find that the road was impassable due to flooding. Ingrum Decl. ¶ 5. According to Plaintiff, JTF-6's construction work rendered the area surrounding the southern portion of the River Road a virtual lake. Id. Although Plaintiff knew that the road was passable from the north, he never attempted to access the property from that direction. Ingrum Dep. at 27, 112-13. Plaintiff testified:

> Q. Can you approach your property from the north?
>
> A. Probably. But I never have.
>
> Q. Why not?
>
> A. Because it's much longer.
>
> Q. Instead of going through Candelaria, then, if you're approaching from the north, what town would you go through?
>
> A. I believe now that you would turn off at Valentine, which is a little town west of Marfa.
>
> Q. Turning off of Route 90?
>
> A. You -- you -- yes. You would take 90 -- you would take 90 west of Marfa. And about 20 or 30 miles, there's a little town called Valentine. And somewhere along in there, . . . there would be a road that would go down to river -- to the river road.

Id. at 27-28. Plaintiff continued:

> Q. . . . We talked about approaching your property from the north. You said there's a road from Valentine.
>
> A. Somewhere around Valentine.
>
> Q. Did you ever take that road?
>
> A. I have not all the way. I've taken it partially. I've taken it from -- from wherever that turnoff is. And I don't -- frankly don't remember whether it's this side of Valentine or the

> other side. I've taken it down to the Rio Grande and went up the -- or went down river a little bit. But I've never taken it all the way to the -- to my property. But that's a long ways. That's a long, hard ride. I mean, you're talking about -- anyway, it's a long hard drive to -- to get that way.
>
> . . . .
>
> Q. Was the river road passable from that direction? Or why did you turn --
>
> A. Yeah. I just -- it was such a long -- you know, the road is so rough. And you're traveling so slow. You know, you're traveling maybe ten miles an hour. And what happened to me, and you hear that it happens to a lot of people, is they go down there and they just get tired of -- my God -- my gosh, how much longer is this thing going to last. And they turn around and come back.
>
> . . . .
>
> Q. So just to the clear, you didn't turn around because the road was impassable --
>
> A. No. The road -- the road was passable.

Id. at 112-13. Plaintiff estimated that accessing his property from the north "would have required an additional 7-9 hours of driving, which was an untenable option." Ingrum Decl. ¶ 5.

From 1999 to 2004, Plaintiff spoke with USBP agents on numerous occasions to determine if the southern entrance to the property was passable. Plaintiff was informed by the USBP on some occasions that the River Road was passable and that he could enter his property. Nonetheless, Plaintiff did not attempt to enter the property because it was not convenient for Plaintiff to make the drive from Austin, Texas.[3]

In May 2004, Plaintiff was informed of the existence of the gravel pit for the first time by a migrant worker named "Lupe" who had trespassed on his property to gain access to the Rio Grande River. Ingrum Dep. at 79. When Plaintiff met Lupe by chance on the street in the town of Candelaria, Lupe informed him that "those guys that worked on the road sure took a lot of material"

[3] Plaintiff testified: "Although on some occasions it was reported to Mr. Ingrum that the road was passable, these were at times when it was not convenient for me to make the arduous drive." Ingrum Decl. ¶ 5.

from "the big gravel pit that they dug back in there." Id. at 81-82.

In January or February of 2005, Plaintiff entered the property and saw the gravel pit for the first time. Ingrum Dep. at 67.

## Procedural Background

On August 2, 2006, Plaintiff filed his first complaint with this Court seeking compensation for Defendant's taking, but dismissed that action voluntarily.[4] Ingrum v. United States, No. 06-566L (Fed. Cl. Dec. 19, 2006). Plaintiff filed the instant Complaint on January 9, 2007, raising the same takings allegation as in his original Complaint. Defendant moved to dismiss the action as untimely filed under 28 U.S.C. § 2501. The Court denied Defendant's motion to dismiss without prejudice on June 26, 2007, because the record was not sufficiently developed on the issue of when Plaintiff first should have known that the fill material was removed from his property. Ingrum v. United States, 77 Fed. Cl. 248 (2007). After conducting discovery, Defendant filed a renewed motion to dismiss on January 25, 2008, again claiming that this action was time-barred.[5] Oral argument on Defendant's renewed motion was held on April 2, 2008.

## Discussion

Defendant seeks dismissal of this action claiming it is time-barred under the six-year statute of limitations governing actions in this Court, 28 U.S.C. § 2501. This statute of limitations "is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." MacLean v. United States, 454 F.3d 1334, 1336 (Fed. Cir. 2006) (quoting Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir.1988)); see generally John R. Sand & Gravel Co. v. United States,128 S. Ct. 750, 753-54 (2008) (The six-year statute of limitations in section 2501 is a jurisdictional requirement for a suit in the Court of Federal Claims.).

When reviewing a motion to dismiss for lack of subject-matter jurisdiction under RCFC 12(b)(1), the court must view all facts alleged in the complaint as favorable to the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). A court may look to evidence outside the pleadings to determine the existence of subject-matter jurisdiction. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988). Where, as here, the Court's subject-matter jurisdiction is put

---

[4] Plaintiff dismissed his original Complaint to cure a potential jurisdictional problem arising under 28 U.S.C. § 1500, stemming from a suit Plaintiff filed in the United States District Court for the Western District of Texas against the United States on August 1, 2006.

[5] Briefing was completed on March 28, 2008. Plaintiff sought leave to file an unsworn, undated statement of Atanacio Baeza and two unauthenticated and undated photographs to supplement his response to Defendant's motion to dismiss. The Court orally denied leave. Tr. (Apr. 2, 2008) at 5.

into question, Plaintiff bears the burden of establishing subject-matter jurisdiction by a preponderance of the evidence. Reynolds, 846 F.2d at 748; Patton v. United States, 64 Fed. Cl. 768, 773 (2005).

28 U.S.C. § 2501 states that "every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. A takings claim accrues when all the events have occurred which fix the liability of the government and the plaintiff knew or should have known of the existence of such events. John R. Sand & Gravel v. United States, 457 F.3d 1345, 1355-56 (Fed. Cir. 2006), aff'd, 128 S. Ct. 750 (Jan. 8, 2008) (quoting Goodrich v. United States, 434 F.3d 1329, 1333 (Fed. Cir. 2006) and citing Hopland, 855 F.2d at 1577).

Here, the parties agree that the taking occurred in April 1999, when the excavation of the pit was completed and the fill material removed. Plaintiff had no actual knowledge of the taking until he was advised of it by a trespassing migrant worker some five years later. Plaintiff claims he had no reason to know of the taking given his distance from the property. He asserts that he was not put on notice of potential injury because, in granting Defendant the Right of Entry to repair the River Road, he did not authorize Defendant to take the fill. See Tr. (Apr. 2, 2008) at 20.

Contrary to Plaintiff's position, longstanding precedent dictates that Plaintiff was on notice of a potential claim because he was aware that the government was entering his property to repair the River Road and the government's actions in removing the fill were open and notorious. In Coastal Petroleum Co. v. United States, 228 Ct. Cl. 864 (1981), the Court of Claims found that the plaintiff was clearly "on inquiry as to the threat to its property rights" where the government was constructing a canal and allegedly effected a taking of the plaintiff's limestone. 228 Ct. Cl. at 867. Although the Coastal Petroleum plaintiff was ignorant of the injury to its mineral rights until some seven years after the taking, the Court held the action time-barred, finding that the plaintiff was "on inquiry as to its possible injury" where the government's actions were open and notorious. Coastal Petroleum, 228 Ct. Cl. at 867. The Court explained:

> Plaintiff alleges, however, that it was simply ignorant of the injury to its mineral rights until 1974, although it admits in its response to defendant's motion that it was aware that the Canal was being constructed. Where the actions of the government are open and notorious, we have pointed out that plaintiff is on inquiry as to its possible injury. Kabua Kabua v. United States, 212 Ct. Cl. 160, 164-65, 546 F.2d 381, 383 (1976), cert. denied, 434 U.S. 821 (1977). Once plaintiff is on inquiry that it has a potential claim, the statute of limitations begins to run. Japanese War Notes, 178 Ct. Cl. at 634, 373 F.2d at 359. Accord, Braude v. United States, 218 Ct. Cl. 270, 585 F.2d 1049 (1978). In the present case, plaintiff was a Florida corporation, with an office staffed by a high-ranking corporate officer in Tallahassee, Florida. The defendant has supplied numerous

> articles from state and national news media to show that the building of the Canal was indeed open and notorious. Plaintiff itself has admitted that it was aware of the construction of the Canal. These circumstances make it amply clear that plaintiff was on inquiry as to the threat to its property rights.

Id.

Here, there is stronger reason than in Coastal Petroleum, to place Plaintiff "on inquiry." Plaintiff was clearly aware of the construction on his property as he signed the Right of Entry -- personally acknowledging that the stretch of River Road on his property would be reconstructed by the government and granting it access to do the work. The government's reconstruction efforts and removal of Plaintiff's fill resulted in an enormous pit visible from the road traversing his property -- unquestionably open and notorious. As such, Plaintiff was on inquiry of a potential claim in April 1999, when the fill material was removed, and the statute of limitations began to run at that time. Id.; see also Catellus Development Corp. v. United States, 31 Fed. Cl. 399, 406-07 (1994) (A takings claim based on a "physical invasion and consequent appropriation of property accrues at the time the invasion is obvious, ascertainable, and permanent.").

Despite the presence of the enormous pit on his property, Plaintiff contends that the alleged taking was "inherently unknowable," due to his inability to visit his property, apparently invoking the "accrual suspension" doctrine. In Martinez v. United States, 333 F.3d 1295, 1319 (Fed. Cir. 2003), the Federal Circuit recognized that the accrual suspension rule may be applied to Section 2501. The Martinez Court explained:

> Martinez invokes authority from this court holding that the accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed. That legal principle is well settled in our cases. See, e.g., Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478, 1482 (Fed. Cir. 1994); Catawba Indian Tribe v. United States, 982 F.2d 1564, 1571-72 (Fed. Cir. 1993); Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988); Kinsey v. United States, 852 F.2d 556, 557 n.* (Fed. Cir. 1988); Welcker v. United States, 752 F.2d 1577, 1580 (Fed. Cir. 1985); Giesler v. United States, 230 Ct. Cl. 723, 725; 1982 U.S. Ct. Cl. Lexis 95 (1982). The government agrees with that legal rule, which is based on a construction of the term "accrues" in section 2501. That rule is distinct from the question whether equitable tolling is available under that statute, although the term "tolling" is sometimes used in describing the rule.

Martinez, 333 F.3d at 1319.[6]

As the Martinez Court noted, "[t]he 'accrual suspension' rule is 'strictly and narrowly applied: . . . [plaintiff] must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was "inherently unknowable" at the accrual date.'" Id. (quoting Welcker v. United States, 752 F.2d 1571, 1580 (Fed. Cir. 1985)); see also L-3 Communications Integrated Sys. v. United States, 79 Fed. Cl. 453, 464 (2007) (finding "a classic case for application of the accrual suspension rule" in that Druyun, an agent of Defendant, "concealed her actions from the world," and stating "[i]t was not until Druyun's other procurement illegalities came to light that the [Inspector General] investigated this procurement, identified it as a candidate for potential wrongdoing by Druyun and prompted L-3 to suspect that something may have been amiss in the C-5 AMP procurement."). In Japanese War Notes Claimants Association of Philippines v. United States, 373 F.2d 356, 359 (Ct. Cl. 1967), the Court recognized that a claim is "inherently unknowable" when there is nothing to alert one to the wrong at the time it occurs -- such as when a fruit tree could not be determined to be the wrong variety at the time of delivery because that was not ascertainable until the tree bore fruit.

Here, there is no concealment or unascertainable condition warranting application of the accrual suspension doctrine. Rather, Plaintiff is deemed to have possessed knowledge of the excavation of fill material that "could have been discovered with the type of inquiry expected of a diligent property owner." Catellus, 31 Fed. Cl. at 408; see LaFont v. United States, 17 Cl. Ct. 837 (1989) (finding that taking claim accrued at the conclusion of obvious dredging operations and rejecting the plaintiff's assertion that the damage to plaintiff's oyster beds caused by the dredging was "inherently unknowable.").

The fact that Plaintiff lived approximately 10 hours away from the property and accessing the property was inconvenient due to the flooding of the south access road does not render his taking claim inherently unknowable. Whether Plaintiff should have known of his claim in April 1999 is determined under an objective standard, not based on Plaintiff's particular circumstances or notions of convenience. Catellus, 31 Fed. Cl. at 408. A property owner is charged with knowledge of what

[6] Invoking "equitable tolling" as opposed to the "accrual suspension" rule is a distinction with a difference. In John R. Sand & Gravel Co., 128 S.Ct. 754, the Supreme Court recently suggested that because 28 U.S.C. § 2501 is jurisdictional the doctrine of equitable tolling may not be applied to this statute. The Court noted that jurisdictional statutes of limitation are "more absolute" and may "forbid[ ] a court to consider whether certain equitable considerations warrant extending a limitations period." Id. at 754; Cf. West Virginia Highlands Conservancy v. Johnson, No. 07-667, 2008 WL 746995 at *13 (D.D.C. Mar. 21, 2008) (reading John R. Sand & Gravel, as precluding equitable tolling under § 2501 stating: "The Court [in John R. Sand & Gravel] reaffirmed that § 2501 is jurisdictional and that notions of equitable tolling do not apply to it."). In contrast, under Martinez, the accrual of a cause of action is suspended until the claimant knew or should have known of his claim.

happens on his property even if the land is remote and difficult to access. Id. In Catellus, the plaintiff whose remote land was accessible only by helicopter or via a combination of off-road driving and hiking claimed it had no knowledge that the Marine Corps had for many years used its property to conduct live fire drills that contaminated the property. Id. at 400. The Catellus plaintiff alleged that its takings claim did not accrue until 1989 when it first learned of the Marine Corps' activities -- even though the Marine Corps had been using the property for live fire training since the 1950s. Id. at 407. Unpersuaded by difficulty the plaintiff had in accessing the remote property, the Court found that the plaintiff's claim could have been discovered with the type of inquiry expected of a diligent property owner. Id. at 408. Here, Plaintiff was capable of gaining entry into his property far more easily than the Catellus plaintiff -- with an additional seven-to-nine hour drive -- compelling the conclusion that Plaintiff's claim was discoverable with reasonable diligence. As such, Plaintiff has not established that the taking was inherently unknowable.

## Conclusion

Plaintiff's claim accrued in April 1999, well over seven years before Plaintiff filed the instant action. As such, Plaintiff's action is time-barred under 28 U.S.C. § 2501, and Defendant's Renewed Motion to Dismiss is **GRANTED**. This action is dismissed for lack of jurisdiction.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**